AO 91 (Rev. 11/11)  Criminal Complaint

FILED
TAMPA, FLORIDA
4-17 2014
UNITED STATES
MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| STEPHEN MAYER | ) | Case No. |
| | ) | 8:14MJ1267 TBM |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___Sept. 18, 2003 to Sept. 14, 2007___ in the county of ___Hillsborough___ in the ___Middle___ District of ___Florida___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to commit wire fraud |

This criminal complaint is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

JEFFREY KATON, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __4-17-14__

_____
*Judge's signature*

City and state: ___Tampa, Florida___

THOMAS B. McCOUN, III, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Jeffrey Katon, am sworn to tell the truth, state the following information:

### I. INTRODUCTION

1.      I am a Special Agent with the United States Secret Service (USSS), and have been so employed since June 1997.  As a Special Agent, I am a federal law enforcement officer and am engaged in enforcing the criminal laws of the United States of America.  I am currently assigned to the Tampa Field Office of the Secret Service and serve on a Financial Crimes Task Force comprised of both Secret Service agents and state law enforcement officers.  My experience as a Secret Service Special Agent has included the investigation of cases involving bank fraud, wire fraud, mail fraud, mortgage fraud, and the use of computers and the Internet to commit fraud.  Additionally, I am certified in the Secret Service Electronic Crimes Special Agent Program.

2.      The information contained in this Affidavit is based on my training, experience and personal knowledge and observations during the course of this investigation, as well as information provided to me by those with knowledge as noted herein.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  The information contained in this affidavit is true and correct to the best of my knowledge and belief.

3.      Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not purport to set forth all of my knowledge or all of the details of the investigation of this matter.  Rather, I have set forth only those facts that I believe necessary to establish probable cause to believe that STEPHEN MAYER

has committed substantive acts of conspiracy to commit wire fraud affecting a financial institution, in violation of Title 18, United States Code, Section 1349.

## II. PROBABLE CAUSE

### A. Overview

4.    From approximately on or about September 18, 2003, and continuing through at least on or about September 14, 2007, Stephen Mayer ("Mayer"), operating through several Florida corporations, including *InvestFund Corp USA, Inc.*, and *Regal Windsor Homes, Inc.*, defrauded several lenders by causing mortgages to be issued based on fraudulent information provided by several "straw buyers" recruited by Mayer. Between on or about September 25, 2003, and March 22, 2005, Mayer and his partner, C.H., brought at least twenty-four (24) properties in Hillsborough County for approximately $2,341,000 and sold these same properties, usually on the same day, for approximately $3,723,290 resulting in a net profit of approximately $1,528,790. The purchasers of these properties, known as "straw buyers", were recruited by Mayer to utilize their good credit in order to obtain mortgage loans for purchases. The "straw buyers" subsequently transferred title back to Mayer and/or one of Mayer's companies. Mayer would facilitate the transfer of properties between his various investors, each time inflating the prices. When these properties were later resold at even greater prices, Mayer again profited from the sales.

5.    Stephen Mayer is a British national currently residing in Miami Beach, Florida. Through this investigation, your affiant developed information that Mayer conspired with his partners and "straw buyers" such as Marcus Esop, HBF, JKH and others, both known and unknown, to unlawfully manipulate and profit from home sales through a series of purchases and straw buyers. A review of the documentation and

2

cooperating witnesses interviews establish these deals were arranged and orchestrated

by Stephen Mayer.

## B. Entities Used in Mortgage Fraud Scheme

6. The following shell companies were formed by or at the director of Mayer

for the purpose of buying, holding and selling the properties involved in this scheme to

defraud:

- Josh One Son Investment Corp.
- Regal Windsor Homes, Inc.
- BanqUSA Select Group, Inc.
- Galoma Investment Group, Inc.
- KCSC, Inc.
- Chen Garza
- Invest Fund Corp USA, Inc.

7. Mayer utilized several title companies to help facilitate his fraud. These

title companies included Sunbelt Title Agency, Scott D. LaRue, Attorney At Law;

Wardell & Quezon, P.A.; Compass Land & Title, LLC; and Accu Title Agency.

8. The first title company used by Mayer was Sunbelt Title Agency located at

2201 4th Street North, St Petersburg, Florida. This office was run by title agent PKM.

PKM allowed Mayer and/or his associates to complete simultaneous closings, i.e. the

closing for the purchase of property would occur and the same time as the closing for

the sale of the same property. Simultaneous closings allowed for the money obtained

from the sale to actually be used to purchase the property. Mayer and/or his

companies used this title agency from in or around September 2003, to in or around

November 2004.

9. Mayer then began using the services of Attorney Scott D. LaRue. LaRue

was a licensed attorney who handled real estate closings. LaRue handled closings for

3

Mayer and his companies at his office in Largo, Florida, from in or around December 2004, in or around March 2005. LaRue died in 2009.

10.     Mayer then moved his business to Attorney Jaime R. Quezon, Wardell & Quezon, P.A., 805 W. Azeele Street, Tampa, Florida. Quezon was a licensed attorney who handled real estate closings. Closings were handled by Quezon's office from in or around January 2005, to in or around April 2006. When Attorney Quezon was closing his practice, he referred his real estate closing clients to Compass Land & Title.

11.     Compass Land & Title, LLC, was owned and operated by PBY. Compass was located at 601 Bayshore Boulevard, Suite 840, Tampa, Florida. PBY stated that he allowed an employee, CLM, to handle the closings for Mayer. Thirteen (13) closings were handled by Compass Land & Title in or around October 2006. According to PBY, CLM disbursed the seller's funds *prior to collecting the buyer's fun*ds, in direct contradiction to the lenders' instructions. PBY stated that CLM disbursed these funds without his knowledge or consent.

12.     Mayer's last closing occurred on or about January 12, 2007, at Accu Title Agency, 6365 53rd Street North, Pinellas Park, Florida. The closing was handled by title agent SDD, who arranged for a disbursement of the sellers fund that was a net amount after deducting the funds required by the buyer.

## C. The Scheme to Defraud

13.     Your affiant and Special Agent Ellen Wilcox, Florida Department of Law Enforcement (FDLE), interviewed multiple witnesses to include SSC, KCC, SLC, JKH, Markus Esop, and NVD, and reviewed public records of property transactions, mortgage loan files, title company files, and bank records. Based on these sources of information, your affiant learned that Stephen Mayer, along with others, purchased

4

multiple investment properties in Hillsborough County starting in 2003. Stephen Mayer and his business partner/boyfriend, CH, located properties to be purchased for a low purchase price. Mayer then purchased the inexpensive properties using his companies Josh One Son Investment Corp or Regal Windsor Homes. Mayer then arranged for the property to be resold the same day to another corporation or straw buyers for a considerably higher purchase price. Mayer directed the straw buyer to obtain a mortgage from a hard money lender. After the sale, the title to the property was transferred back, via quit claim deed, to Mayer and/or Mayer's company at Mayer's direction.

14.    Mayer told the straw buyers that the properties were to be fixed up and rented by Mayer. Within one or two years, the property was resold by Mayer to another individual, again for a higher purchase price with a new mortgage, usually from a federally insured financial institution, allowing Mayer to again profit from the flip. In some cases, this sale was necessitated by a foreclosure suit filed by the first mortgage holder. Mayer orchestrated this fraud utilizing straw buyers and manipulating home values through inflated appraisals, resulting in a loss of approximately $2.75 million to multiple financial institutions.

15.    Mayer utilized "straw buyers" who had good credit to purchase properties. Mayer arranged for these straw buyers to get loans from either hard money lenders or federally insured banks. Mayer paid the straw buyers a commission for being a purchaser, ranging from $1,000 to $10,000 per property. Mayer also paid the down payment for the buyer from the seller's proceeds resulting from the inflated sales prices. Mayer utilized title agents who permitted down payments to be paid after the closing and/or with the seller's funds.

16. Between on or about November 13, 2003, and on or about September 17, 2007, Mayer utilized the following straw buyers:  SSC, KCC, SLC, JKH, Markus Esop, NVD, HBF and others.

- KCC, individually and/or through his corporation KCSC, purchased ten (10) properties between on or about November 13, 2003, and on or about April 20, 2005, totaling $1,095,100.  These properties were later sold to other straw buyers, for example, to JKH or NVD.

- SLC, individually and/or through his corporation Chen Garza, purchased five (5) properties between on or about April 23, 2004, and on or about July 5, 2005, totaling $1,385,500.  These properties were later sold to straw buyers JKH, NVD or HBF.

- JKH purchased eighteen (18) properties between on or about November 12, 2004, and February 17, 2006, totaling $4,557,800.  Some of these properties were sold to straw buyers HBF or NVD.

- HBF purchased five (5) properties between August 24, 2006, and December 4, 2006, totaling $2,258,000.

- NVD, individually or joined with her husband, Markus Esop, purchased seven (7) properties from Mayer's companies between August 23, 2006 and January 12, 2007, totaling $2,550,000.

17.     Markus Esop, a licensed mortgage broker, pled guilty to conspiracy in connection with this scheme on or about June 28, 2012 (Case no. 8:12-cr-237-T-17AEP). In his plea agreement, Esop admitted he purchased at least ten properties in his name and his wife's name or just in his wife's name from August 2006, to January 2007.  The properties were closed through correspondent lenders, who, several days later, sold the

6

loans to and affected FDIC insured financial institutions.  These properties were purchased through loan applications that contained material misrepresentations and false statements regarding employment and income, funds for closing, and disclosure of other properties and the liabilities for the other loans.  Specifically, defendant knew that the funds to close were in fact borrowed from his investment partner / seller, Mayer and that this information was not disclosed to the lender.  These material misrepresentations induced lenders to disburse funds for the loans by wire transfer.

        *i.*     *SSC and KCC*

    18.    Your affiant and Special Agent Ellen Wilcox, FDLE, interviewed straw buyers SSC and KCC.  SSC and KCC are a married immigrant couple from Taiwan.  Both worked full time jobs, SSC as a customer service representative at a telecom company and KCC at a restaurant.  According to these witnesses, they knew Mayer because he leased a building that they owned in 2001 for one year.  At the conclusion of the lease, Mayer owed SSC and KCC approximately $15,000 - $20,000.  Mayer suggested that the couple convert their debt into an investment in his real estate business.  Later, in 2003, Stephen Mayer called SSC to discuss his real estate business.  SSC stated that Mayer was operating his business out of a home that he owned at 3514 9th Street, Tampa, Florida.  Mayer told the SSC and KCC that he would use someone's good credit to purchase properties, then fix up the property and re-sell it for a profit.  Mayer told SSC and KCC that he arranged for the purchaser to borrow the money for the purchase from a hard money lender, usually San Jose Investment Corp., which charged a high rate of interest.  Mayer induced SSC and KCC to become one of his investors.

    19.    Mayer proposed using the SSC or KCC's names and good credit to

purchase properties and borrow money from the hard money lender. Mayer told SSC and KCC that he would pay them a commission on each property purchased. When they signed the papers to purchase a home, Mayer would give them a commission check for $1,000 to $3,000. As the dollar amounts of the loans got higher, the percentage paid for commissions also got higher. Mayer set up companies for each of the properties purchased, including: *KCSC, Inc.* for KCC and Stephen Mayer; *Invest Fund Corp USA* for SCC and Stephen Mayer; and *Chen Garza* for SLC and Stephen Mayer. SSC and/or KCC made initial loans to purchase real estate for $30,000 and later $45,000. They received a commission from Mayer for each purchase and then quick claimed the deed for the property back to him or a company under his control.

20.    In January 2006, Mayer suggested to SCC that she should buy into his real estate business. He proposed SCC put up $250,000 and receive 30% interest on her investment. Mayer estimated the value of the business at over $1 million and showed SCC a spreadsheet of all of the properties that were owned by his company, *Invest Fund Corp USA*, to support this value. SSC gave Mayer $110,000 and used the money Mayer owed her as the remainder of her investment. SSC then went to work at Invest Fund. Soon, SSC realized that Invest Fund was actually short of money and she had made a bad investment. SSC would ask Mayer how they could make money at Invest Fund and he would reply "don't ask for your money back."

21.    SSC estimated that she lost $200,000 investing with Mayer, including funds she and her husband borrowed from their aged parents. Mayer wrote SSC two checks for $50,000 each, but both bounced.

ii.    SLC

22.    USSS Special Agent Lisa Chan and SA Ellen Wilcox, FDLE interviewed

8

SLC, the son of SSC and KCC. SLC stated that Stephen Mayer bought properties, renovated them, and re-sold them for a profit. SLC stated that SCC and KCC saw that he and his wife were struggling financially and encouraged him to take part in some real estate deals with Mayer so SLC could obtain a commission from Mayer. SLC agreed and allowed his name to be used to form a corporation called *Chen Garza*. SSC recalled being present at two closings where he purchased two properties, sight unseen, under the corporate name of *Chen Garza*. SLC stated that he was not aware of what exactly he was signing, but signed the documents presented to him at the closings and received a commission of approximately $7,500 for the first purchase and approximately $10,000 for the second. SCL was left with mortgages on the properties, which he was then advised to quick claim deed back to Mayer.

23.     SLC advised he never made any mortgage payments and that Mayer "took care of everything," to include finding the lenders and supposedly selling or "flipping" the property. SLC said it was not until he received a foreclosure notice regarding the second property that he knew something was wrong. He ultimately discovered that his credit had been ruined because he was responsible for paying the mortgages.

24.     SA Wilcox showed SLC a picture of a house located at 1715 E. Columbus Drive in Tampa. According to property records, SLC, signing for *Chen Garza*, bought the property on or about October 27, 2004 from *Josh One Investment Corp*. SLC signed for a mortgage of $137,000. SLC did not recognize the property but recalled attending the closing at Sunbelt Title. SLC also recognized his signatures on the mortgage and security agreements. SLC also recognized his signature on documents

9

selling the property to Markus Esop's wife, NE, but did not recall attending the closing at Compass Title.

25.     SA Wilcox then showed SLC a picture of a house located at 5005 Troydale Road.  SLC did not recognize the property, but confirmed his signature on mortgage documents borrowing $550,000 for *Chen Garza* to purchase the property from *Regal Windsor Homes, Inc.*, an entity set up by Mayer's partner, CH, on or about April 23, 2004.  SLC also confirmed his signature on a transfer of title document for this property from *Chen Garza* to Stephen Mayer dated October 14, 2004.

### iii.     Markus Esop

26.     Your Affiant and SA Ellen Wilcox interviewed Markus Esop, who is cooperating with this investigation pursuant to his guilty plea to conspiracy to commit wire fraud affecting a financial institution.  Esop stated that he first met Stephen Mayer through a mutual friend in 2005.  Mayer approached Esop to handle a couple of loans for SCC and, a few months later, loans for JKH.  Based on conversations with Mayer, Esop understood that Mayer's general scheme was to pull the equity out of property as the market was going up.  Mayer would sell the property to an associate to strip the equity, but Mayer would have the associate quit claim the property back so that Mayer could maintain control.  Mayer always wanted to control the closings so he could control where the proceeds went.  According to Esop, Mayer also hired the appraisers who would artificially inflate the property's value for refinancing purposes.

27.     Esop began investing with Mayer in 2006.  Esop stated that Mayer put together spreadsheets with all of the properties that included address, outstanding

balance, rent amount, cash flow, estimated value, estimated profit, estimated repairs, etc. Whenever Mayer felt the property had appreciated, he would resell it again to another investor. Esop purchased over $3 million worth of real estate through Mayer. He admitted that he never saw the homes before he bought them. He also stated that the loan applications he submitted and signed at closing on behalf of him or his wife contained false information, particularly false income, in order to get the financial institutions issuing the mortgages to lend him the funds to buy the properties. Esop explained that the seller was usually Mayer or someone / some entity working on his behalf and that Mayer would provide the buyer with the funds needed for closing. This fact was not disclosed to the lenders.

28.     Esop's closings mostly used the title services of Compass Title. Esop stated that Compass would transfer the seller proceeds to Mayer's personal account or the account of an entity under Mayer's control. Mayer would then transfer the amount of funds Esop as the buyer needed to close to Esop's account. Esop also stated that at every closing, he signed the closing papers first and then brought the cashier's check for the buyer's cash for closing later. Esop stated that the title agent, PBY, allowed this to happen because he made money off of every closing and because Mayer promised him a lot of business.

29.     Esop explained that Mayer was supposed to make the mortgage payments on the properties he and his wife bought and that the extra equity and monthly rent were supposed to be deposited into a joint account to cover repairs and mortgages. Despite this, Mayer controlled the joint account and stopped making mortgage payments on all of Esop's investment properties in 2007. Most of all of these properties went into foreclosure.

11

30.     Esop also stated that HBF worked for him at his mortgage company and

invested with Mayer.  Records show HBF bought over $2 million worth of real estate in

an approximately six month period.  Her loan applications state that she was a CFO

and earned $3,400.  Esop confirmed both the title and income information on these

*[handwritten: $24,000  Per month.]*

loan applications were false.  Esop understood that like himself, Mayer was supposed

to make the mortgage payments on the properties HBF bought but that Mayer stopped

making the payment sin 2007, and all of the properties went into foreclosure.

iv.  JKH

31.     Your affiant and SA Ellen Wilcox, FDLE, interviewed JKH.  JKH stated

that he met Stephen Mayer in 2004.  Mayer explained to JKH that he "flipped real

estate" by purchasing homes as investment properties with hard money, renovated the

homes, and then sold the homes to someone (a buyer or another investor like JKH)

with good credit who could purchase the home with money from a conventional

mortgage lender.  If the purchaser was another investor, Mayer would then have his

management company (BanqUSA Select Group, Inc. or Invest Fund Corp USA, Inc.)

rent out the home and manage the property.  JKH stated that Mayer promised to split

the rental profits with him.  JKH stated Mayer also promised to make the mortgage

payments through his company accounts.

32.     JKH purchased eighteen (18) properties between November 12, 2004,

and February 17, 2006, totaling $4,557,800.  JKH stated that Mayer located the homes

to purchase, the lenders, and the closing company.  Mayer would tell JKH when a

closing was going to occur and JKH would show up to sign the closing documents.  JKH

stated that he did not read the documents that he was asked to sign at closing.  JKH

stated that he did not provide any funds for a down payment nor did JKH bring any

12

funds to a closing. JKH stated that Mayer always came to the closing with a check if any funds were needed. At the closing, JKH signed a quit claim deed transferring the title to the property to Mayer's company. JKH understood that he continued to be responsible for the mortgage on the property. JKH was told by Mayer to put the properties in Mayer's company name in order to protect himself from liability, in case any of the renters sued. JKH was told by Mayer that lenders had programs for people that had good credit scores.

33. JKH understood that the financing arranged by Mayer were "no doc" loans; therefore, JKH provided Mayer little to no documentation for the mortgage lender. Mayer told JKH that "no doc" loan programs allowed JKH to keep qualifying for loans, up to 18 loans. During this time period, JKH was working as a bartender, making approximately $50,000 annually (both wages & tips). On one of the loan applications signed by JKH in July 2005, his employment had been listed as CFO of *Galoma Investment Group*, 1327 17th Avenue North, St Petersburg, Florida, making $12,095 per month ($145,140 per year). This application was submitted by Markus Esop as the loan officer.

34. During the interview, JKH stated that everything went well for approximately six (6) months to one (1) year. JKH stated that he had no written agreement with Mayer related to these 16 investment properties. JKH said that he believed Mayer was making the mortgage payments and claimed he was renting the homes. JKH recalled Mayer showing him rental agreements for six to eight of the properties. JKH stated that he was even making a little money; for a short while, Mayer paid JKH approximately $100 per week. JKH stated that by the end of 2006, "everything started going south" and payments from Mayer ceased. JKH started getting

13

notices that the mortgages were not being paid. JKH confronted Mayer and Mayer told JKH that he was having trouble getting renters for some of the homes. Mayer then made some of the mortgage payments and the notices stopped, but only for a short period of time. When the mortgage payment late notices started arriving again, JKH told Mayer that he needed to sell the homes. JKH stated that Mayer was able to sell nine (9) of the properties. JKH stated that he was supposed to get 30% of the profit from the sale of an investment property but JKH claimed that he did not receive any profit from the sale of any of the nine (9) properties. The rest of the properties were foreclosed and one deficiency judgment has been filed against JKH. JKH stated that after the foreclosure notices started coming in, JKH could never get in touch with Mayer.

35.     Your affiant reviewed JKH's property purchases with him during this interview. JKH admitted that he saw only a few of the investment homes that he purchased and that he did not help with any of the renovations on the homes that he purchased. While reviewing the property purchases, JKH admitted that he did not pay attention to which properties he was purchasing. JKH did not realize that he had purchased 3514 N. 9th Street (Mayer's first office), 2306 N. Nebraska Avenue (Mayer's 2nd office), and 5005 Troydale Road (Mayer's home).

### D.     REVIEW OF PROPERTY RECORDS AND MORTGAGES

36.     The following properties were implicated in Mayer's scheme to defraud in as much as individuals, operating at Mayer's direction, took out mortgages containing false statements in order to purchase properties, which they deeded back to Mayer:

| Address | Date of Sale | Seller | Buyer | Price | Lender |
|---------|--------------|--------|-------|-------|--------|

14

| 2914 N. 17th Street | 08/23/2006 | KCSC, Inc. | NVD | $340,000 | First NLC Financial |
|---|---|---|---|---|---|
| 4852 Troydale Road | 08/24/2006 | SSC | HBF | $995,000 | Silver State Financial |
| 1715 E. Columbus Dr. | 09/29/2006 | Chen Garza | NVD | $240,000 | First NLC Financial |
| 2306 Nebraska Ave | 10/12/2006 | Invest Fund Corp USA | HBF | $310,000 | Greenpoint Mortgage |
| 2911 N. 18th Street | 10/31/2006 | Invest Fund Corp USA | NVD | $190,000 | Ownit Mortgage |
| 915 E. 23rd Avenue | 11/17/2006 | BanqUSA Select Group | HBF | $395,000 | Greenpoint Mortgage |
| 913 E. 28th Avenue | 11/20/2006 | Invest Fund Corp USA | NVD | $160,000 | American Brokers Conduit |
| 918 14th Avenue | 11/20/2006 | Invest Fund Corp USA | NVD | $275,000 | American Brokers Conduit |
| 711 E. James Street | 11/20/2006 | Invest Fund Corp USA | NVD | $245,000 | Hometown Mortgage |
| 3510 N. 11th Street | 12/4/2006 | Invest Fund Corp USA | HBF | $273,000 | Greenpoint Mortgage |
| 3514 N. 9th Street | 12/6/2006 | Invest Fund Corp USA | HBF | $285,000 | Greenpoint Mortgage |
| 5005 Troydale Road | 1/12/2007 | Invest Fund Corp USA | NVD | $1,100,000 | Silver State Financial |

i.   *2914 N. 17th Street, Tampa, Florida*

37.   Your affiant reviewed the property records filed in the Clerk of the Court

for Hillsborough County, which revealed that this property was sold to *Josh One Son*

*Investment Corp.* for $91,000 on or about August 2, 2004.  Approximately two weeks

later, on or about August 17, 2004, Mayer, using *Josh One Son Investment Corp.*,

flipped this property to KCSC, Inc. for $161,000 (a $70,000 increase).  Mayer's partner,

CH, as President of *Josh One Son Investment Corp.*, signed the warranty deed.  Mayer

investor SSC and *KCSC, Inc.* obtained a $175,000 mortgage loan from MH Lending

Corp (a hard money lender).  On or about August 23, 2006, *KCSC, Inc.* sold this

property to another Mayer investor, Esop's wife, NVD, for $340,000 ($179,000 increase

in 24 months). Stephen Mayer, as President of *KCSC*, signed the warranty deed.

38.     Subsequently a residential mortgage loan was issued by First NLC Financial Services on or about August 23, 2006 to NVD in the amount of $306,000 for the purchase of 2914 N. 17th Street, Tampa. Markus Esop admitted that the income listed for his wife on this mortgage application was falsified. NVD also obtained a second mortgage of $17,000 from the seller, *KCSC, Inc.*

39.     Esop stated that this property was one of the deals outlined by Stephen Mayer on his worksheets. Mayer had estimated the After Repair Value of this home at $385,000, the cost of rehab at $60,000, the costs for closing at $20,000, and the six (6) months of the debt service at $24,255. Therefore, Mayer estimated that Esop would make a net profit of $165,245. Mayer also told Esop that the monthly rent potential should cover the monthly "carry costs", i.e. mortgage, insurance, and real estate taxes.

40.     The closing file from Compass Land & Title Company, the loan closing and escrow agent for the NVD loan, shows the disbursement of loan funds by First NLC Financial Services in the amount of $310,280.21 on or about August 23, 2006. The HUD-1 in the Compass Land & Title Company file shows that the seller was to receive $124,427.04 and the buyer was to provide $18,230.84 to close. The HUD-1 was signed by NVD, Stephen Mayer, and CLM as the closing agent on the date of the closing, on or about August 23, 2006.

41.     The bank records show only $107,131.04 of the closing funds for the seller, *KCSC, Inc.* were wired by Compass Land & Title to the *KCSC, Inc.* account #-3782 at Bank of America on or about August 23, 2006. Stephen Mayer then wrote check #1147, drawn on the KCSC account #-3782, payable to Markus Esop & NVD for $18,231.00. As a result, Mayer used his seller proceeds to give the funds to close to

the buyer's without the lender's knowledge.  The bank records for Markus Esop & NVD

account #-8263 at Bank of America show that check #1147 from KCSC was deposited

in Esop's account #-8263 on or about August 23, 2006, at 1512 hours.  Esop stated

that he did not make that deposit, and identified the handwriting on the deposit slip as

Mayer's.  Esop stated that Mayer would have called him after the funds were in the

account and then Esop went to the East Hillsborough BOA branch near his office and

purchased the cashier's check.  On or about August 23, 2006, Esop withdrew

$18,230.84 from his account #-8263 at the East Hillsborough branch of Bank of

America and purchased cashier's check #5145240, payable to Compass Land & Title.

Esop reported that he delivered the cashier's check to PY at Compass Land & Title the

day after closing, which is confirmed by the Compass Land & Title Bank of Tampa

records.  This property went into foreclosure.

> ii.    *4852 Troydale Road, Tampa, Florida*

42.    This property was purchased by *Josh One Investment Corp.* for $250,000

on or about October 14, 2004.  The same day, *Josh One Investment Corp.* flipped this

property to *Chen Garza, Inc.* for $444,000 (a $194,000 increase).  *Chen Garza, Inc.,*

and Mayer investors DG and SLC obtained a $422,500 mortgage from San Jose

Investment Corp. of America.  On or about July 4, 2005, *Chen Garza, Inc.* quit claimed

this property to Mayer investor SSC.  The quit claim deed was signed by SLC as

President of Chen Garza.  On or about March 15, 2006, SSC and KCC obtained an

$880,000 mortgage loan from Winstar Mortgage Partners, Inc.  On or about August 24,

2006, SSC sold this property to yet another Mayer investor, HBF, for $995,000 (a

$551,000 increase in 22 months).  Two residential mortgage loans were issued by

Silver State Financial Services, Inc. on or about August 24, 2006, to HBF in the amount

of $796,000 and $199,000 for the purchase of 4852 Troydale Road, Tampa, Florida.

43.      The closing file from Compass Land & Title Company, the loan closing

and escrow agent for the HBF loans, show the disbursement of loan funds by Silver

State Financial Services in the amount of $801,409.59 and $193,171.05 on or about

August 24, 2006. The HUD-1 showed that the seller was to receive $77,770.89 and the

buyer was to provide $21,482.19 to close.

44.      SSC recalled to agents that she was concerned about this property and

that only the first mortgage payment was made to the lender because Mayer's company

could not afford to make any more of the payments. SSC called the mortgage lender

and arranged to personally pay three mortgage payments at one time. By that time, the

mortgage had been assumed by a standard FDIC-insured lender. SSC told Mayer that

he needed to fix this problem and Mayer assured SSC that he would find somebody

else to buy the property. SSC understood that HBF worked for Markus Esop and that

she was involved in Mayer's real estate investments. SSC understood that HBF would

allow Mayer to use her good credit to buy home and HBF would be paid a commission.

45.      When your affiant showed SSC check #1279 drawn on *Invest Fund Corp

USA, Inc.* account #004431297514 at Bank of America, payable to HBF for $7,000

dated August 24, 2006, SSC stated that this would have been the commission check

paid to HBF for this purchase. SSC stated that a commission check was always a

round number, such as $1,000 or $2,000. SSC acknowledged that she signed this

Invest Fund check. This check #1279 for $7,000 was deposited into HBF's personal

checking account.

46.      When your affiant showed SSC check #1307 drawn on an *Invest Fund

Corp USA, Inc.* account at Bank of America, payable to HBF for $21,482.19 dated

August 24,2006, SSC stated that they (Mayer & SSC) paid HBF this money so that she could complete the purchase of this property. This fact was never disclosed to the lender.

47.    Bank records establish that the closing funds for the seller, SSC, were wired by Compass Land & Title to the *Invest Fund Corp USA, Inc.* account #-7514 at Bank of America on or about August 24, 2006 at 1549 hours, the day of the closing. Invest Fund Check #1307 made payable to HBF for $21,482.19 was used to purchase a cashier's check on or about August 25, 2006, at 0924 hours, the day *after* closing. This cashier's check, representing the supposed down payment by the buyer, was not deposited until on or about August 25, 2006 at 1009 hours into the Compass Land & Title account at Bank of Tampa.

48.    Records filed in the Clerk of the Court for Hillsborough County showed that HBF sold this property in a short sale on or about November 16, 2007, for $415,000.

### iii.    1715 Columbus Drive, Tampa, Florida

49.    This property was purchased by *Josh One Investment Corp.* on or about October 27, 2004, for $45,000 and flipped to *Chen Garza, Inc.* the same day for $122,000 (a $77,000 increase). The warranty deed was signed by Mayer's partner, CH, President of *Josh One.* Also on or about October 27, 2004, SLC and *Chen Garza, Inc.* obtained a $137,200 mortgage from MH Lending Corp (a hard money lender). In or around July 2006, MH Lending filed a foreclosure lawsuit against *Chen Garza* and SLC. On or about September 29, 2006, *Chen Garza, Inc.* sold this property to another Mayer investor and Esop's wife, NVD, for $240,000 (an $118,000 increase in 23 months). SLC signed the warranty deed as President of *Chen Garza, Inc.*

19

50.     A residential mortgage loans was issued by First NLC Financial on or about September 29, 2006 to NVD in the amount of $216,000. Markus Esop has admitted that the income listed for his wife on this mortgage application was falsified. The HUD-1 showed that NVD obtained a second mortgage of $17,000 from the seller, *Chen Garza, Inc.* However, a second mortgage was never recorded in the official records of the Clerk of the Court for Hillsborough County and no second mortgage documents were found in the title file obtained from the closing agent, Compass Land & Title.

51.     The closing file from Compass Land & Title Company, the loan closing and escrow agent for the NVD loan, showed the disbursement of loan funds by First NLC Financial Services, LLC in the amount of $219,111.22 on or about September 29, 2006. The HUD-1 found in the Compass Land & Title Company file shows that the seller was to receive $84,146.89 and the buyer was to provide $25,987.44 to close. The HUD-1 was signed by NVD, SLC and CLM as the closing agent on the date of the closing on or about September 29, 2006.

52.     Bank records show that part of the closing funds for the seller, $71,646.89, were wired by Compass Land & Title to the *Chen Garza, Inc.* account at Bank of America on or about October 3, 2006 – four days after the closing. On or about October 3, 2006, $14,000 was transferred to *Invest Fund Corp USA* and $6,000 was transferred to *KCSC, Inc.* On the same date, Stephen Mayer wrote *Chen Garza* account check #1031 payable to cash for $25,636.00. This cash was deposited into Markus Esop and NVD's bank account. This transaction was done by Stephen Mayer at the Bank of America branch located at 600 Peachtree Street NE, Atlanta, Georgia, on or about October 3, 2006 at 1233 hours. Your affiant reviewed the bank records of

Markus Esop and NVD account at Bank of America. At 1331 hours on or about October 3, 2006, Markus Esop wrote his check #1698 payable to Bank of America for $25,635.94. These funds purchased cashier's check #5145751 payable to Compass Land & Title. This cashier's check was deposited on or about October 3, 2006, into the Compass Land & Title #-9070 at Bank of Tampa.

53. A foreclosure lawsuit was filed in or around April 2007. Markus Esop reported that an arsonist burned the house and homeowner's insurance paid off the mortgage company. The land is still owned by Markus Esop.

*iv.    2306 Nebraska Avenue, Tampa, Florida*

54. This property was purchased by *Josh One Son Investment Corp.* on or about January 15, 2004, for $45,000 and flipped the same day to *KCSC, Inc.* for $169,000 (a $124,000 increase). The warranty deed was signed by Mayer's partner, CH, President of *Josh One Son Investment Corp.* Also on or about January 15, 2004, *KCSC, Inc.* and Mayer investor KCC obtained a $210,000 mortgage loan from San Jose Investment Corp of America. On or about February 17, 2006, *KCSC, Inc.* sold this property to Mayer investor JKH for $500,000 (a $331,000 increase in 25 months). Stephen Mayer signed the warranty deed as President of *KCSC, Inc.* JKH obtained a $213,150 mortgage from San Jose Investment Corp. of America. Also on or about February 17, 2006, JKH quit claimed this property to Mayer's company, *Invest Fund Corp USA, Inc.* On or about October 12, 2006, *Invest Fund Corp USA, Inc.* sold this property to another Mayer investor, HBF, for $310,000. Stephen Mayer signed the warranty deed as President of Invest Fund Corp USA, Inc. ($190,000 decrease in 8 months).

55. Two residential mortgage loans were issued by Greenpoint Mortgage

21

Funding, Inc. on or about October 12, 2006, to HBF in the amount of $248,000 and
$31,000. On her stated loan applications, HBF claimed that she was the CFO of
Esop's mortgage broker company, Interactive Financial, for 12 years, and made
$24,000 per month. Esop confirmed HBF worked with him and did deals with Mayer,
but stated that HBF was not the CFO and never made $24,000 per month working at
Interactive Financial. On her applications, HBF also inflated her bank account
balances.

56.     The closing file from Compass Land & Title Company showed the
disbursement of loan funds by Greenpoint Mortgage Funding in the amount of
$249,916.00 and $31,005 on or about October 12, 2006. The HUD-1 showed that the
seller was to receive $74,519.29 and the buyer was to provide $42,503.74 to close.
The HUD-1 was signed by HBF, Stephen Mayer and PY as the closing agent on the
date of the closing, October 12, 2006.

57.     Bank records reveal that the closing funds for the seller, *Invest Fund Corp
USA*, were wired by Compass Land & Title to the *Invest Fund Corp USA, Inc.* account
#-7514 at Bank of America on or about October 13, 2006 – the day after closing. The
BOA records for Invest Fund Corp USA, Inc. account #-7514 then show that check
#1365 was drawn payable to the buyer, HBF for $46,503.74. Cashier's check
#5058991 for $42,503.74 was purchased at the Davis Island Branch of Bank of
America on or about October 13, 2006 at 1221 hours. HBF took the remaining $4,000
in cash. This cashier's check was deposited on October 13, 2006 into Compass Land
& Title #-9070 at Bank of Tampa. Therefore, Mayer, the seller, provided HBF, the
buyer, with the funds to close from his proceeds from the sale and HBF did not provide
her down payment until the day after closing. Neither party disclosed these facts to the

22

lending institution.

58.     On or about March 30, 2010, the property was sold by the Clerk of Court due to its foreclosure.

            v.      2911 N. 18th Avenue, Tampa, Florida

59.     This property was purchased by *Josh One Son, Inc.* for $30,000 on or about March 22, 2005, and immediately flipped to *KCSC, Inc.* for $89,000 the same day (a $59,000 increase). On or about November 10, 2005, *KCSC, Inc.* sold the property to Mayer investor JKH for $166,000 (a $77,000 increase in 8 months). JKH obtained a $132,800 first mortgage and $166,600 second mortgage from Taylor, Bean & Whitaker Mortgage Corp. On or about November 11, 2005, JKH quit claimed the property to Mayer via *Invest Fund Corp USA, Inc.* On or about October 10, 2006, a foreclosure lawsuit was filed against JKH. On or about October 31, 2006, *Invest Fund Corp USA* sold this property to Markus Esop and NVD for $190,000. Stephen Mayer, President of *Invest Fund Corp USA*, signed the warranty deed.

60.     A residential mortgage loan was issued by Ownit Mortgage Solutions on or about October 31, 2006 to Markus Esop and NVD in the amount of $171,000 for the purchase of 2911 N. 18th Avenue, Tampa. Markus Esop has admitted that he failed to disclose other investment properties and mortgage obligations on this application. The HUD-1 showed that the seller was to receive $23,409.15 and the buyer was to provide $25,699.33 to close on October 31, 2006.

61.     Bank records show that the seller's proceeds of $22,909.15 were wired to the *Invest Fund Corp USA, Inc.* account #-7514 at Bank of America on or about November 2, 2006 - three days after closing. Records from that account include check #1388 payable to Markus Esop and NVD for $21,699.93 dated November 2, 2006. The

23

BOA records for Markus Esop and NVD's account #-8263 show that Invest Fund check #1388 was deposited into account #-8263 at 1400 hours. Markus Esop then wrote his check #1707 payable to Bank of America to obtain a cashier's check. This cashier's check was deposited on November 3, 2006 at 0915 hours into Compass Land & Title #-9070 at Bank of Tampa. Thus, as with all of the other sales, Mayer, the seller, provided the buyer with the funds to close without the knowledge of the lender. Moreover, these funds were not provided to the title agent until several days the sale and purchase took place.

62.     The Compass Land & Title file ledger showed that this closing was short $4,000. During an interview, Esop reported that he remembered this closing because a couple of days later, the title agent PY, called screaming about the check being short and threatened to call the attorney general's office to report Esop and Mayer. Esop stated that he had to withdraw $4,000, from his savings account to cover the shortage. Esop actually purchased the $4,000 cashier's check on November 13, 2006 using his check #1710 drawn payable to Bank of America. Cashier's check #5151624 was purchased at the East Hillsborough branch for $4,000 on November 13, 2006, which was later deposited into the Compass Land & Title account on November 14, 2006, approximately two weeks after the closing.

63.     Records filed in the Clerk of the Court for Hillsborough County showed that Marcus Esop sold this property as a short sale on or about June 29, 2007, for $116,800.

           vi.     *915 E. 23rd Avenue, Tampa, Florida*

64.     This property was purchased by *Regal Windsor Homes, Inc.* for $110,000 on or about December 2, 2004. *Regal Windsor Homes, Inc.* flipped this property to

*BanqUSA Select Group, Inc.* the next day, on or about December 3, 2004, for $198,500 (an $88,500 increase). Mayer's partner, CH, as President of *Regal Windsor Homes*, signed the warranty deed. Mayer investor DG and *BanqUSA Select Group, Inc.* obtained a $221,900 mortgage from MH Lending, LLC. On or about November 17, 2006, *BanqUSA Select Group, Inc.* re-flipped this property to Mayer investor HBF for $395,000. Stephen Mayer, President of *BanqUSA Select Group*, signed the warranty deed.

65.   Two residential mortgage loans were issued by Greenpoint Mortgage Funding, Inc. on or about November 17, 2006 to HBF in the amount of $316,000 and $39,500. On the application, HBF claimed that she was the CFO of Interactive Financial for 12 years, making $24,000 per month. Esop stated that HBF was neither the CFO nor made $24,000 per month working at Interactive Financial.

66.   The closing file showed the disbursement of loan funds by Greenpoint Mortgage Funding in the amount of $316,390.36 and $39,350.00 on or about November 17, 2006. The HUD-1 stated that the seller was to receive $132,625.62 and the buyer was to provide $61,301.02 to close on November 17, 2006. A review of bank records shows, however, that the seller, Mayer, provided the funds to the buyer to close on the date of closing.

67.   A foreclosure lawsuit was filed in April 2007 by Greenpoint Mortgage Funding, Inc.; however, the Judge ordered the case dismissed on December 10, 2010. The records of the Hillsborough County Property Appraiser's Office show this property still owned by HBF.

vii.   *913 E. 28th Street, Tampa, Florida*

68.   This property was purchased by *Josh One Son, Inc.* for $36,500 on or

25

about November 12, 2003. *Josh One Son, Inc.* flipped this property to *KCSC, Inc.* the next day for $66,500 (a $30,000 increase). *KCSC, Inc.* and KCC obtained a $96,000 mortgage from San Jose Investment Corp of America (a hard money lender). On or about December 23, 2003, KCSC, Inc. quit claimed this property to Mayer investor DG. The deed was signed by Stephen Mayer as President of KCSC, Inc. On or about August 5, 2004, DG quit claimed this property to Mayer's company B*anqUSA Select Group, Inc.* On or about September 20, 2005, *BanqUSA Select Group, Inc.* sold this property to Mayer investor JKH for $145,000 (a $78,500 increase in 22 months). Stephen Mayer signed the warranty deed as *President of BanqUSA Select Group, Inc.* JKH obtained $116,000 1st mortgage and $14,500 2nd mortgage from Amnet Mortgage. On or about September 28, 2005, JKH quick claimed deeded the property to Mayer via *Invest Fund Corp USA, Inc.*

69.     On or about November 20, 2006, *Invest Fund Corp USA, Inc.* sold this property to Mayer investor NVD for $160,000 (a $15,000 increase in 14 months). Stephen Mayer signed the warranty deed as President of *Invest Fund Corp USA, Inc.* NVD obtained two residential mortgage loans from American Brokers Conduit on or about November 20, 2006, for $128,000 and $16,000 to facilitate the purchase of 913 E. 28th Avenue, Tampa. Markus Esop has admitted that the income listed for his wife on this mortgage application was falsified. On the application, NVD did not disclose her ownership in any of the prior real estate that she had purchased, except her primary residence. Markus Esop admitted that he was aware that his wife's loan documents contained misrepresentations relating to non-disclosure of property ownership and their corresponding liabilities.

70.     The closing file for the NVD loans showed the disbursement of loan funds

26

by American Brokers Conduit in the amount of $127,792.14 and $15,680.94 on or about November 20, 2006. The HUD-1 reflected that the seller was to receive $11,330.24 and the buyer was to provide $25,876.92 to close. The HUD-1 was signed by NVD, Steve Mayer and the closing agent on the date of the closing, November 20, 2006. Your affiant reviewed the closing file and located Scott LaRue Trust Account Check #2548 payable to *Invest Fund Group USA* for $11,330.24 dated November 21, 2006. Your affiant further reviewed the bank records of *Invest Fund Group USA* account #-7514 at Bank of America. On November 21, 2006, SSC, acting for Mayer, wrote three checks on this account: check #1415 payable to herself for $5,000 to "repay loan"; check #1416 payable to Cash for $4,000 to "repay loan Steve Mayer;" and check #1417 payable to Cash for $500 to "repay loan [CH]."

71.    The BOA records of Markus Esop and NVD account #-8263 show that on or about November 21, 2006, the day after the closing, there was an interbank transfer into Esop's account #-8263 from Mayer's *BanqUSA Select Group* account #-3559 for $25,900. Esop then transferred $25,876.92 to the title attorney's trust account at Bank of America. Thus, Mayer provided the buyer with the funds to close a day after the closing using the proceeds of the sale. None of this information was disclosed to the lender.

72.    A foreclosure lawsuit was filed by Countrywide Home Loans in or around June 2007; however, the foreclosure was dismissed in 2009. The records of the Hillsborough County Property Appraiser's Office show this property still owned by NVD.

viii.    *918 E. 14th Avenue, Tampa, Florida*

73.    This property was purchased by Mayer's company *Regal Windsor Homes* for $77,500 on or about December 21, 2004. Regal Windsor Homes flipped this

27

property the same day to another Mayer investor, GS for $137,695.00 (a $60,195 increase). Mayer's partner, CH, signed the warranty deed as President of *Regal Windsor Homes*. On or about the same date, December 21, 2004, GS quit claimed this property to *BanqUSA Select Group*. On or about July 1, 2005, BanqUSA Select Group sold this property to Mayer investor JKH for $226,000 (an $88,305 increase in seven months). JKH obtained a $203,400 mortgage loan from American Mortgage Network, Inc. On or about July 17, 2005, JKH quit claimed this property to Mayer via *Invest Fund Group USA, Inc.* On or about November 20, 2006, Invest Fund Group USA sold this property to NVD for $275,000.

74. NVD obtained two residential mortgage loans from American Brokers Conduit on or about November 20, 2006, in the amounts of $220,000 and $27,500 for the purchase of 918 E. 14th Avenue, Tampa. Markus Esop, who facilitated the purchase, admitted that the mortgage applications failed to disclose accurate income, assets or liabilities for his wife.

75. The closing file showed the disbursement of loan funds by American Brokers Conduit in the amount of $220,510.33 and $27,306.31 on or about November 20, 2006. The HUD-1 revealed that the seller was to receive $44,475.96 and the buyer was to provide $38,608.24 to close. The HUD-1 was signed by NVD, Steve Mayer and the closing agent on the date of the closing. November 20, 2006.

76. In the closing file was a Scott LaRue Trust Account check #2549 payable to *Invest Fund Group USA* for $44,475.96 dated November 21, 2006. On or about November 22, 2006, these funds were deposited into the *Invest Fund Group USA* account #-7514 and then transferred to *BanqUSA Select Group* account #-3559 at Bank of America. The BOA records of Markus Esop and NVD account #-8263 show

28

that on or about November 21, 2006, there was an interbank transfer into Esop's account #-8263 from BanqUSA Select Group account #-3559 for $38,608.24. Esop then transferred $38,608.24 to the closing attorney's Trust Account #-7723 at Bank of America the same day. Thus, Mayer provided investor NVD and Esop with the funds to close. This information was not revealed to the lender.

77.     Records filed in the Clerk of the Court for Hillsborough County showed that NVD sold this property as a short sale on December 5, 2007 for $72,000.

        *ix.     711 E. James Street, Tampa, Florida*

78.     This property was purchased by *Josh One Son Investment Corp.* for $66,500 on or about December 1, 2003. *Josh One Son Investment Corp* flipped the property to *BanqUSA Select Group, Inc.* a day later, on or about December 2, 2003, for $107,500 (a $41,000 increase). *BanqUSA* obtained a $149,500 mortgage loan from San Jose Investment Corp. of America (a hard money lender). On or about March 1, 2004, *BanqUSA Select Group* quit claimed the property to Mayer investor DG. On or about August 5, 2004, DG quit claimed the property back to *BanqUSA*. On or about July 1, 2005, *BanqUSA* sold this property to JKH for $220,000 (an $112,500 increase in 19 months). JKH obtained a $198,000 mortgage from Amnet Mortgage. On or about July 14, 2005, JKH quit claimed the property to *Invest Fund Group USA, Inc.* On or about November 21, 2006, *Invest Fund Group USA* sold this property to NVD for $245,000.

79.     Hometown Mortgage issued two mortgages on or about November 21, 2006, to NVD in the amounts of $171,500 and $49,000 for the purchase of 711 E. James Street, Tampa. Markus Esop admitted that the income listed for his wife on this mortgage application was falsified. The closing file from Scott LaRue, Esquire, the loan

29

closing and escrow agent for the NVD loan, showed the disbursement of loan funds by Hometown Mortgage Services in the amount of $218,768.48 on or about November 27, 2006. The HUD-1 in Scott LaRue's file showed that the seller was to receive $22,040.58 and the buyer was to provide $40,002.61 to close. The HUD-1 was signed by NVD, Steve Mayer and Scott LaRue as the closing agent on the date of the closing, November 21, 2006.

80. The sales proceeds were disbursed via Scott LaRue's trust account check #2561 payable to *Invest Fund Group USA* for $22,040.58 dated November 27, 2006. The BOA records for Invest Fund Group account #-7514 show that *Invest Fund* transferred $15,040.58 to *BanqUSA Select Group, Inc.* account #-3559 on or about November 27, 2006.

81. On or about November 22, 2006, the day after closing, bank records show transfers totaling approximately $40,000 from accounts controlled by Mayer to Esop's account at Bank of America to provide the funds to close. The lender was not told that the seller provided the funds to close from the proceeds of the sale and that the funds to close were not actually paid until the day after the closing.

82. Records filed in the Clerk of the Court for Hillsborough County showed that Esop sold this property via short sale on or about December 3, 2008 for $171,500.

        *x.*    *3510 North 11th Street, Tampa, Florida*

83. Mayer, using *Josh One Son Investment Corp,.* purchased this property for $69,000 on or about July 8, 2004. To inflate the price, Mayer used *Josh One Son Investment Corp* to flip the property to another Mayer-controlled entity, *BanqUSA Select Group, Inc.*, the same day for $134,500 (a $65,500 increase). Mayer investor DG and *BanqUSA Select Group* obtained a $135,100 mortgage from MH Lending Corp. On or

about November 23, 2004, BanqUSA Select Group, Inc. sold this property to another Mayer investor SLC for $208,000 (a $73,500 increase in four months). On or about April 20, 2005, SLC quit claimed this property to *Chen Garza, Inc.* On or about August 12, 2005, Chen Garza, Inc. sold this property to Mayer investor JKH for $220,000 ($12,000 increase in nine months). Stephen Mayer, as Vice President of Chen Garza, signed the warranty deed.

84.     JKH obtained a $176,000 mortgage from Entrust Mortgage, Inc. JKH also quick claim deeded the property to Mayer via *Invest Fund Corp. USA.* On or about August 23, 2006, a foreclosure lawsuit was filed against JKH for failure to pay on the mortgage. In order to forestall the foreclosure, on December 4, 2006, *Invest Fund Corp USA, Inc.* sold this property to yet another Mayer investor, HBF, for $273,000 (a $53,000 increase in 14 months). Stephen Mayer, President of *Invest Fund Corp USA*, signed the warranty deed.

85.     HBF obtained two residential mortgage loans from GreenPoint Mortgage Funding, Inc. on or about December 4, 2006, in the amount of $218,400 and $27,300. On the application, HBF claimed that she was the CFO of Interactive Financial for 12 years, making $24,000 per month. Esop stated that HBF was neither the CFO nor never made $24,000 per month working at his company, Interactive Financial.

86.     The closing file from Scott LaRue, Esquire, the loan closing and escrow agent for the HBF loan, showed the disbursement of loan funds by Greenpoint Mortgage Funding in the amount of $217,935.36 on or about December 4, 2006. The HUD-1 i showed that the seller was to receive $22,381.06 and the buyer was to provide $38,618.47 to close. The HUD-1 was signed by HBF, Steve Mayer and Scott LaRue as the closing agent on the date of the closing, December 4, 2006.

31

87.     In the closing file was a Scott LaRue issued trust account check #2615 payable to *Invest Fund Corp* USA for $22,381.06 on December 6, 2006. The BOA records for *Invest Fund Corp USA, Inc.* account #-7514 show that Invest Fund had transferred money for two closings, totaling $102,607.81, to HBF's account #-9142. This transfer, which occurred on or about December 6, 2006, two days after closing, included the buyer's close and the $500 earnest money for this property closing (total $39,118.47). The lender was never advised that the seller used the proceeds from the sale to provide the buyer's cash to close and that these funds were not provided to the closing agent until two days after closing.

88.     A foreclosure lawsuit was filed in or around June 2007, by GreenPoint Mortgage Funding, Inc. The Judge dismissed the case on or about July 11, 2011, due to lack of prosecution. The lawsuit was later reopened. However, HBF filed bankruptcy on June 1, 2012. The records of the Hillsborough County Property Appraiser's Office show this property still owned by HBF.

          xi.     *3514 North 9th Street, Tampa, Florida*

89.     Mayer purchased this property via *Josh One Son Investment Corp.* for $34,500 between approximately September 25 and September 30, 2003.[1] Within one or two days, Josh One Son Investment Corp. sold this property to Mayer investor DG and *BanqUSA Select Group, Inc.* for $76,500 (a $42,000 increase). On or about August 5, 2004, DG quit claimed the property to *BanqUSA Select Group, Inc.* On or about September 28, 2005, *BanqUSA* sold the property to Mayer investor JKH for $219,000 ($142,500 increase in 24 months). JKH obtained a $175,200 mortgage loan

---

[1] The purchase and filing dates of these transactions are conflicting but all of the events happen within this date range.

32

from Taylor, Bean & Whitaker Mortgage.  On or about October 6, 2005, JKH quit claimed the property back to Mayer via *Invest Fund Corp USA, Inc.*  On or about November 7, 2006, a foreclosure lawsuit was filed against JKH because Mayer failed to make payments on the mortgage.  In order to forestall the foreclosure, Mayer acting through *Invest Fund Corp USA, Inc.* sold the property to HBF on or about December 4, 2005, for $285,000 (a $66,000 increase in 15 months).

90.     HBF obtained two residential mortgage loans from GreenPoint Mortgage Funding, Inc. on or about December 4, 2006, to HBF in the amount of $208,000 and $26,000.  The mortgage applications had inflated income and employment information for HBF.  The closing file from Scott LaRue showed the disbursement of loan funds by GreenPoint Mortgage in the amount of $207,528.04 on December 4, 2006.  The HUD-1 in Scott LaRue's file showed that the seller was to receive $85,906.47 and the buyer was to provide $61,989.34 to close.  The HUD-1 was signed by HBF, Steve Mayer and Scott LaRue as the closing agent on the date of closing, December 4, 2006.

91.     Investigators traced these monies and determined that Scott LaRue issued Trust Account Check #2601 payable to *Invest Fund Corp USA* for $85,906.47 on or about December 6, 2006, two days after closing.  The BOA records for *Invest Fund* show that *Invest Fund* had transferred money for two closings, totaling $102,607.81, to HBF's account #-9142.  This transfer, which occurred on or about December 6, 2000, included the $61,989.34 cash to close and the $500 earnest money for this property closing (total $62,489.34).  The bank records for HBF, Bank of America, account #-9142, show that on or about December 7, 2006, three days after closing, a counter debit for $101,607.81 was used to purchase cashier check #5235062.  Your affiant reviewed the bank records for the Trust Account records for Scott LaRue at Bank of

33

America, account #-7723. Cashier check #5235062 was deposited into LaRue trust account #-7723 on December 7, 2006 at 1500 hours, which included the $62,489.34 for closing on this property. The lender was never told that the seller's proceeds were funneled back to the buyer to provide the cash to close and that those funds were not produced to the closing agent until three days after closing.

92.     GreenPoint Mortgage Funding, Inc. filed a foreclosure lawsuit against HBF in or around May 2007. On or about October 21, 2009, the property was sold by the Clerk of Court due to this foreclosure and a certificate of title was issued to Greenpoint Mortgage Funding, Inc.

xii.     *5005 Troydale Road, Tampa, Florida*

93.     Mayer, using *Josh One Son*, purchased this property for $540,000 on or about April 27, 2004, and immediately quit claimed this property to *Regal Windsor Homes, Inc.* On or about the same date, Mayer flipped the property to *Chen Garza, Inc.* for $530,000 (a $10,000 decrease). *Chen Garza, Inc.* obtained a $550,000 mortgage from hard money lender San Jose Investment Corp. On or about October 14, 2004, *Chen Garza, Inc.* resold this property to Steve Mayer for $615,000 (an $85,000 increase in six months). Steve Mayer obtained a $460,500 mortgage from BankUnited. On or about January 7, 2005, Steve Mayer quit claimed this property to *BanqUSA Select Group, Inc.* On or about October 20, 2005, *BanqUSA* quit claimed this property back to Steve Mayer. On or about November 10, 2005, Steve Mayer quit claimed the property back to *BanqUSA Select Group, Inc.* On or about December 15, 2005, *BanqUSA* sold this property to Mayer investor JKH for $915,000 (a $300,000 increase in 14 months). JKH obtained a $640,500 mortgage from American Brokers Conduit. JKH quit claimed the property back to Mayer via *Invest Fund Corp USA, Inc.* less than

two weeks later, on or about December 26, 2005.  On or about September 19, 2006, a foreclosure lawsuit was filed against JKH because Mayer had failed to make the mortgage payments.  As with other properties, to avoid foreclosure, Mayer / *Invest Fund Corp USA* sold this property to Markus Esop and NVD for $1,100,000 on or about January 12, 2007.

94.    NVD obtained two residential mortgages from Silver State Financial Services on or about January 12, 2007, in the amounts of $770,000 and $220,000.  On the application, NVD failed to disclose her true assets and liabilities.  The closing file from Accu Title Agency showed the disbursement of loan funds by Silver State Financial Services in the amount of $772,999.49 and $213,180.60 on or about January 12, 2007.  The HUD-1 showed that the seller was to receive $284,957.14 and the buyer was to provide $147,650.05 to close.  The HUD-1 was signed by NVD, Steve Mayer and SDD as the closing agent on the date of the closing, January 12, 2007.

95.    A review of the closing file showed that SDD, the closing agent, did not receive any funds from the buyer NVD.  SDD deducted the cash due from buyer from the seller proceeds and then wire transferred $137,307.09 to *Invest Fund Corp USA* account #-7514 on or about January 17, 2007.

96.    A foreclosure lawsuit was filed and a certificate of title was issued to Washington Mutual Bank on January 4, 2012.

### E.  FRAUD AFFECTING A FINANCIAL INSTITUTION

97.    Title 18, United States Code, Section 1343 makes it a violation of federal law for anyone, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted any writing, signs,

signals, pictures or sounds, by means of interstate wire for the purpose of carrying out the scheme to defraud. Title 18, United States Code, Section 1349, makes it a violation of federal law to conspire to commit mail and wire fraud, among other things. Title 18, United States Code, Section 3293 establishes a ten year statute of limitations for wire and mail fraud offenses affecting a financial institution, including conspiracies.

98.    On or about October 30, 2013, your affiant telephonically interviewed a representative of Capital One bank. The Assistant General Counsel of Capital One provided the following information related to their relationship with Greenpoint Mortgage during the time the mortgages described above were issued:

- GreenPoint Mortgage Funding, Inc. is a New York corporation and in 2004, was a wholly owned subsidiary of GreenPoint Bank, an FDIC insured NY State Saving Bank.

- In November of 2004, GreenPoint Bank was acquired by North Fork Bank, a NY State Saving Bank. GreenPoint Mortgage then operated a wholly owned subsidiary of North Fork Bank, which also was an FDIC insured institution.

- In December of 2006, Capital One Financial Corporation acquired North Fork Bancorporation at a holding company level. So at that point, North Fork Bank was owned by Capital One, but still operated as North Fork Bank, an FDIC insured State Saving Bank, and GreenPoint remained a subsidiary thereof.

- In August 2007, North Fork Bank merged into Capital One, N.A., a national bank, and at that time, GreenPoint Mortgage became a wholly owned subsidiary of Capital One N.A. GreenPoint Mortgage

36

has been, and remains today, a wholly-owned subsidiary of a bank

that was FDIC insured, so any fraud or losses suffered by

GreenPoint Mortgage, would affect its FDIC insured parent bank.

99.     On or about October 29, 2013, your affiant and Special Agent Ellen

Wilcox, FDLE, located JL, former underwriter from GreenPoint Mortgage during the

years 2005 – 2007.  JL advised as an underwriter, she would not have approved loans

if she knew information on the applications was not accurate or inflated income was

known to her.

### Conclusion

100.     Based upon the foregoing, your affiant submits that there is probable cause

to support that STEPHEN MAYER, together with others, engaged in a conspiracy to

commit wire fraud affecting a financial institution, in violation of Title 18, United States

Code, Section 1349.  Accordingly, it is respectfully requested that the Court issue a warrant

for the arrest of STEPHEN MAYER for the crime of conspiracy to commit wire fraud.


This completes my affidavit


JEFFREY KATON
Special Agent

Sworn to and subscribed before me
this ___/7___ day of April, 2014.

THOMAS B. McCOUN, III
United States Magistrate Judge