### United States District Court In The Middle District of Florida Tampa Division

United States of America)
   V   )
 Stephen Mayer  )

**Case Number 8:14-CR-00190-SCB-EAJ**

Filing Date: April 6th 2015

### Motion for a change of venue & the replacement of counsel.

*Comes now Stephen Mayer Pro Se and humbly submits this Motion for a change of venue in the above titled case to the Southern District of Florida or an alternate jurisdiction with the subsequent appointment of a geographically appropriate replacement of counsel.*

The defendant alleges that the conduct of an officer of this court set in motion a chain of events resulting in, but not limited to the violation of the defendants constitutional rights and civil liberties. Which, coupled with statements from the bench and prejudiced rulings affecting the preservation of the defendants work product, privileged material and the defendants access to council; culminating in the appointment of counsel as a sham and nothing more than a formal compliance with the requirement that an accused be given the assistance of counsel under the Sixth Amendment.

In Support of this motion the defendant proffers the following:

1) The defendant has no options for legal advice and support pursuant to the court's ruling of October 20th 2014, under which the defendant is specifically barred from instructing any attorney on any matter or seeking a second legal opinion of this case's appointed counsel. (See DKT 51 and 57)

2) Mary Mills is a seventeen year veteran of the Federal Public Defenders office in Tampa. Ms. Mills is an attorney who was initially appointed as the defendant's public defender.

3) From August 2014 through October 13th 2014 the defendant wrote multiple letters to Ms. Mills over his general concerns and detailing his analysis of the discovery in terms of its value to the defendant's case, to which, Ms. Mills stated, it did not matter, in so far as, ' The Government destroys evidence and still wins their case".
(See Exhibits 1A,1B,1C,1D,1E,)

4) Ms. Mills stated in August of 2014 that she was trying to negotiate a new trial commencement date with Ms. Riedel the AUSA, for one week earlier than the trial certain date of October 27th 2014 in order to avoid personal scheduling conflicts. Ms. Mills subsequently claimed less than ten days prior to the trial certain date of October 27th 2014, that she had not had sufficient time to prepare for trial.

5) On October 8th 2014 prior to an ex-parte hearing before Judge Jenkins Ms. Mills urged the defendant to share all of his concerns and criticisms about Ms. Mills and her trial preparedness with Judge Jenkins. In that hearing, Judge Jenkins responded by stating, words to the effect that the defendant couldn't expect the same type of representation from a public defender as compared to a privately instructed one. (See Dkt.36)

6) On October 8th 2014 Ms. Mills and her colleague Mr. Vitier contacted  the  defendant's general counsel Daniel Jonas via a telephone conference call to him in Miami and discussed the Defendants options and Ms. Mills recommendations, in order, to enlist Mr. Jonas's assistance in persuading the defendant to Ms. Mills view of the defendant's options.

7) On October 14th 2014 Ms. Mills visited the defendant and acknowledged a copy of a letter the defendant had sent to the Federal Public Defender, Donna Lee Elm. This letter was motivated by the defendant's desperation at Ms. Mills failure to file any pre-trial motions, or prepare for the defense of the defendant in the upcoming trial.
(See Exhibit 1F)

8) On October 15th 2014 Judge Jenkins signed a temporary order which restricted the defendant from sharing discovery material any notes of discovery material, or making any reference to its contents, which, effectively served as a well-crafted, thinly veiled gag order. (See Dkt. 47 and Exhibit 1G)

9) On October 15th 2014 Ms. Mills filed a sealed motion for an 'in camera, ex-parte' hearing as a means to withdraw as counsel. Ms. Mills's motion contained a number of disingenuous statements in support of her claims. (See Exhibit 1H)

10) On October 15th 2014 a notice of filing a second declaration of authentication of business records by the USA was entered into the docket. ( See Dkt. 42)

11) On October 20th 2014 Judge Bucklew ruled in favor of Ms. Mills's motion to withdraw as counsel and cancelled the trail certain commencement date of October 27th 2014. (See Dkt. 52)

12) On October 20th 2014 the defendant filed a pro se motion to protect his Sixth Amendment rights to counsel and to respond to Ms. Mills motion to withdraw as counsel. Two significant pages of this motion have not materialized in the court docket (some content of the missing pages was read by the defendant during the' in camera ex-parte' hearing of Ms. Mills motion to withdraw as counsel). The missing pages of the defendant's motion detailed the conference phone call by Ms. Mills with Mr. Jonas which would necessarily serve to impeach Ms. Mills statements in her motion to withdraw. The missing pages also reference details of Ms. Mills action in restricting the defendants physical access to any attorneys without Ms. Mills permission from October 15th 2014 with the support of the defendants jailers. (See Dkt. 50)

13) On October 20th 2014 Judge Bucklew ruled against the defendants pro se motion and further ruled that the defendant could not instruct any attorney for any subject matter without prior court approval, which was to be sought by the defendant filing a pro se motion.(See Dkt. 51 & 57)

14) From October 15th through October 20th Ms. Mills crafted an environment of fear and panic for the defendant using her power and influence with the Government's Jailers. The Pinellas County Sherriff's Department; confirmed by Ms. Mills, was, through Sergeant Krakowsky, supporting Ms Mills's instruction to prevent the defendant from physical access to any attorney on any subject matter without Ms. Mills's approval. Ms. Mills further notified the defendant's personal attorney that he was expressly forbidden to provide any legal advice to the defendant.

15) Written requests for the formal protocol of an investigation into Ms. Mills conduct and the protocol for the protection of the defendants sixth amendment rights to counsel and speedy trial have remained un-answered. ( See Exhibits 1I & 1J)

16) During the period of October 15th 2014 through October 20th 2014 several unopposed orders were granted in favor of the Government; one of these orders was for an order of protection for discovery. This order through the interpretation of it, by third parties in their compliance with it, provided the Government with access to the defendants extensive work product and multiple items of privileged correspondence.

17) On October 21st 2014 Judge Jenkins appointed Bjorn Brunvand as the defendant's replacement counsel.

18) On October 27th 2014 the defendant telephoned Mr. Brunvand's office to discuss the protection of the defendant's privileged material and correspondence when third parties complied with the Governments protective order. This request was further memorialized

in the defendants letter to Mr. Brunvand dated October 31st 2014 and additionally in letters dated November 17th 2014. Mr. Brunvand however, failed to respond and subsequently advised the defendant that the Government had ultimately encountered this issue and at some point handed off the return of the material to a third party. (See Exhibits 1K,IL,1M)

19) During the period December 11th 2014 through January 19th 2015 the defendant re-catalogued the discovery and restructured the files and documents from discovery providing copies of the material through thumb drive down loads to counsel and written critiques of numerous documents in support of the defendants position and which would serve to impeach potential witnesses based on prior statements.

20) On January 12th 2015 the defendant met with Ms. Quinn-Adams, the court appointed investigator and inquired as to the details of the title and lien holder searches for the four properties listed on the indictment. Further subject discussion revolved around unraveling the issue of Green Point Mortgage Funding's real ownership, its previous name of Credit Suisse, a subsidiary of CS First Boston and the multiple issues with how Green Point Mortgage Funding operated, specifically, what licenses etc. It was also discussed if the witnesses the defendant was anticipating at trial were being contacted and arranged.

21) On January 14th 2015 the defendant asked Mr. Brunvand if he believed the defendants extensive research into the world of shell companies with nominee directors was the real motivation behind this prosecution. The defendant drew Mr. Brunvand's attention to the November 3rd 2010 sensational email the defendant had received from Tampa attorney Mark Hankins; a press article from New Zealand from 2012 referencing the Defendant and his research into the corporate service provider of companies shipping arms from North Korea and money laundering for drug cartels, and an email from the London law firm of Bryan Cave of May 11th 2013, which, had resulted in the defendant helping to squash a hostile takeover of the only independent Television Station in the Ukraine. At the time the defendant had believed the actions in the Ukraine were being orchestrated by Russian based agitators and as a pro American the defendant had been willing to assist. Mr. Brunvand stated, he very much doubted there was any connection, as, he claimed, this case was far too poorly constructed. (See Exhibits 1N,1O,1P)

22) On January 14th 2015 at the same meeting with the defendant, Mr. Brunvand stated, when asked by the defendant about his defense strategy and why Mr. Brunvand had failed to file any pretrial motions:
i) the problem was," this was not supposed to go to trial", that I was supposed to be afraid like everyone else and take the plea deal I had been offered.
ii) That my issues with Judge Bucklew's rulings were a matter for the Appellate Court.

iii) That I had "rocked the boat", that "She was not happy with me" and that my sentence was pre-determined. On January 15th the defendant wrote to Mr. Brunvand to ask what options really existed for him and further referenced some of these comments. (See Exhibit 1Q)

23) On January 19th 2015 the defendant wrote to Mr. Brunvand to raise further the issue with his overall defense strategy for the trial and referenced the possible significance of Judge Jenkins remarks of October 8th (See Exhibit 1R )

24) On January 20th and 21st at the end of the first two days of the trial, the defendant wrote to Mr. Brunvand raising questions about trial strategy and concerns as to when and how evidence and witness lists for the defense would and could be entered. (See Exhibits 1S,1T)

25) On January 23rd 2015 the defendant handed the Judge a letter addressing his concern at counsel's failure to challenge the Governments discovery which was admitted into evidence containing a number of erroneous issues that gave significant rise to the validity of the attestations of authenticity for the exhibits. This letter further referenced the written notice the defendant provided counsel on January 1st and January 5th 2015 of the numerous issues with errors in the Government's discovery. This letter also addressed the issue of Credit Suisse Securities (USA) LLC attestations for certain mortgage documents which contradicted Government claims of chains of title for loan documents significant to the case etc. These same issues had been raised with the defendant's prior attorney of record Mary Mills. (See Exhibits 1U, 1V)

26) On January 26th the defendant delivered to the judge, a hand written letter detailing his concerns and seeking advice in understanding his options for what he described as his counsels failings to act in any meaningful manner. (See Exhibit 1W)

27) On January 26th 2015 Mr. Brunvand made an oral motion for an 'ex-parte in camera' hearing at which time Judge Bucklew tabled it for the end of the trail day.

28) The defendant was under the impression the 'ex-parte in camera' hearing took place at approximately 4.45 p.m. on January 26th 2014, however, the defendant cannot locate a docket number for it. Court appearances require the defendant to be woken at 3.30 a.m. and transported from 4.15 a.m. between several holding cells, take a forty five minuet van ride for court appearances at 9 a.m.; it is therefore possible that exhaustion played a part in the defendant's confusion as to his understanding of this event.

29) On January 31st 2015 the defendant wrote to Mr. Brunvand seeking specific information on the preservation of the defendants work product and the protocol for trial transcripts and the preservation of audio recordings. To date no response to this letter has been received. (See Exhibit 1X )

30) On February 10th 2015 the defendant wrote to Mr. Brunvand following up with the request that answers be provided pursuant to the defendants January 31st, 21st, 20th, 15th, 5th and 1st Correspondence. Further, that Mr. Brunvand provides clarification of the defendant's current legal rights. To date no response to this letter has been received. (See Exhibit 1Y )

The Defendant believes these circumstances have caused the prejudicial handling of his case by the court and created a bias where he cannot receive fair and impartial hearings.

Sworn to this 6th day of April 2015 under penalty of perjury with copies furnished by USPS this same day to the following parties:

Amanda Riedel,
Suite 320)
400 North Tampa Street
Tampa, FL 33602

Bjorn Brunvand
615 Turner Street
Clearwater, FL 33756

Stephen Mayer
Citrus County Detention Center
Agency Number 02303104
2604 West Woodland Ridge Drive
Lecanto FL 34461

August 6th 2014                                          1 of 5

Stephen J Mayer   Docket # 1598371
Pinellas County Jail
14400 49th Street   North
Clearwater FL. 33762 U.S.A.


Ms Mary Mills
Assistant Federal Defender
400 North Tampa Street (Suite 2700)
Tampa FL. 33602 U.S.A.


CC1   Donna Lee Elm
CC2   Daniel Jonas   FAX 1-305-866-7063
CC3   Fairtrials International
CC4


RE: United States v Stephen Mayer (Case # 8:14-CR-190-T-24-EAJ)
    Federal Inmate Reference # 02-303-104


Dear Ms Mills,


          Pursuant to our meeting of July 31st I write
to raise my concerns with regard to the defense of my
case. As you are aware, I was arrested at my home in
Miami on April 29th by Secret Service Agents who entered my
home 'Un-invited' without a warrant or indictment. I was
immediately taken into custody and held at the Miami
Federal Detention Facility until my removal to the

Tampa district on July 2nd 2014.

I remained in custody at the Pinellas County Jail without an appearance before a Judge until July 17th and only then because I contacted the Tampa Public defenders office the prior day, inquiring about rules of appearance and procedure. At my initial appearance in Tampa on July 17th, we briefly met and I entered a not guilty plea before the court.

On July 21st I telephoned your office to inquire who would be representing me on an ongoing basis and when I could expect to meet with them. I was told to call back to see if my case had been assigned and to whom. When I called the following day we spoke and during that brief exchange you stated my options for a speedy trial were little to non existent in that you could not be ready within that time frame.

On July 24th you and your collegues attended a meeting at the Pinellas County Jail to discuss my case. As you had stated on the phone you re-iterated the issue of reading a defense within the speedy trial rules; I felt extremely defeated in that meeting, in that I felt the ability to digest the financial subject matter of my case lacking, to the extent point that I found myself saying, "what do the Government want from me?" A statement I made because I felt utterly helpless and defeated in that moment.

On July 31st you visited me for a second time and informed me that I would shortly receive the discovery material that your office was in receipt of.

A list of discovery files was delivered to me on August 4th although at the time of writing this letter a means to view them has not been forth coming.

During our meeting on July 31st I believe you reference 'Flipping real estate' as a detriment to real estate values, an obvious concern to me when my case, in part, centers around the Governments challenge to the legality of Flipping real estate. At this same meeting you expressed concern that an email I had managed to have sent you was copied to several other parties and I clarified, that those parties were well walking known associates who were in part familiar with the case I am facing, they being Daniel Jones a Miami based attorney, Cynthia O'Murchu a Financial Times of London staff reporter and Gerald Ryle the head of the ICIJ a Washington D.C. based International Consortium of Journalists. I further asked that you communicate with Daniel Jones directly as he was familiar with my case and prepared to provide further support and assistance on a pro-bono basis. Your initial response that you didn't want to work with another attorney or querying, 'who was representing me' is alarming, when for my part I will take any help I can get!'

I cannot begin to describe the numerous horror stories I have heard during my weeks of incarceration and the psychological toll these events have on someone in my position; not least because the feeling of receiving a comprehensive defense with the type of resources necessary seem, at first sight lacking in a timely fashion. Indeed the single appearance I have had to date in Tampa was horrendous in that I spent 12 hours in Ankle chains and a round trip to court and Jail in a vehicle with little to no ventilation and in-adequate air conditioning parked for more than 30 minuets prior to our 'unloading' with prisoners becoming more and more stressed, that one sought in his panicked state to rock violently against the van walls to get attention and relief. I am informed that this is a common occurance and after that one appearance I was almost ready to plead guilty to anything! With this said and your multiple references to the inability to mount a defense without my waiving my right to a speedy trial I am extremely disturbed, in so far as it is my understanding that trial time is about scheduling rather than the allocation of time in the preparation. I would therefore employ you to look within your organization to fully employ any and all of the remedies available to better serve a timely and comprehensive defense in my case.

Finally, while I do not instinctively feel my defense requires such legal maneuvers in challenges to rules

...ed evidence and possibly subpoenas that may have been used in the collection of bank records etc. I do however feel a comprehensive defense should at least include these options and at the very least a discussion.

As I am sure you are aware communications are next to impossible and the PDF file I have emailed to you should provide a good starting point in my defense. As I am able to examine the charges filed I will provide you with as much feedback as I can but at this point I am still unclear as to exactly what it is the Government is accusing me of conducting.

Yours Sincerely,

Stephen Mayer

August 12th 2014 _____ 1 OF 2

Stephen Mayer Docket #1599371
Pinellas County Jail
14400 North 49th Street
Clearwater FL 33762 USA

Ms. MARY MILLS
ASSISTANT FEDERAL DEFENDER

CC1 DONNA LEE ELM
CC2 DANIEL JONAS
CC3 ROSE VALDEZ
CC4 Honorable Ed. Carnes
CC5 Fairtrials International
CC6 Cynthia O'Murchu

    RE: UNITED STATES v STEPHEN MAYER CASE# (8:14-CR-190-T-
    24-EAJ)

Dear Ms. Mills,
    As you are aware discovery files with regard to
the above case were delived in pdf format on computer discs on
August 4th 2014 to the Pinellas County Jail. These disc's, it was
claimed, contained 27000 PdF files which I understand was the entire
discovery material collected by the Goronment. At 5pm on August 11th
I was provided with my first opportunity to view these files. I can
confirm there are four computer disc's but the total file content is
only 475 seperate files, therefore I would like confirmation that these
disc's are in fact the entire scope of the discovery material. More
alarming of course is that your office has been in receipt of
these files for over two weeks and it is I who is raising the issue
for the first time!

    I have now spent several hours viewing these
files and have found glaring and contradicting in references
made in the complaint which formed the basis of my arrest.
    I have highlighted a couple of the more outlandish
contradictions on the attached sheets with regard to what the

Government claim in their complaint and what in reality the discovery material actually shows. The statements detailed in the complaint by Shin Sheng, 'Susan' Chen bare no resemblance to the evidence. Ms. Chen was very familiar with all corporate matters and was a signatory to multiple corporate bank accounts from 2006 through 2007. Ms. Chen wrote and signed numerous checks totaling hundreds of thousands of dollars in the course of our everyday business activities. In March of 2006, discovery shows, she wrote and signed the check for our purchase of an apartment building, located at 4211 West North A Street, a check in the amount of $250,000-00 used for the downpayment and closing costs.

Further evidence shows Esop, the Governments primary witness receiving thousands of dollars in rental income, none of which was used to pay the mortgages he was responsible for. Discovery also shows in May of 2007 Esop Refinanced a property he had purchased from Mayer and generated thousands in cash out by financing it for a higher loan amount, these proceeds were banked and held in Esop bank accounts and of absolutely no benefit to Mayer or Chen.

These contradictions in evidence are no small matter, in another instance a mortgage I am accused of providing down payment assistance for is shown to be approved by the lender in the amount of $1.1 million but as a 100% loan with no down payment required, a title also in the discovery material.

I am now more confused than before as to exactly what the Government is charging me with and how such glaring contradictions in the evidence can have provided for my arrest. I do however know, I have spent 15 weeks in Federal custody and in view of these holes in the Governments case I would like to hear your action plan for dealing with my case. I would also welcome a discussion on making an effective argument for bond, which I feel appropriate and essential in order that I can properly participate in my defense, therefore please advise me when we may further discuss these issues?

Sincerely

Stephen Mayer

# Stephen Mayer
Pinellas County Jail Docket Number 1599371
14400

September 4th 2014

Mary Mills
Assistant Federal Defender
Park Tower - Suite 2700
400 N Tampa St
Tampa, Florida 33602

Re:    United States v Stephen Mayer, Case Number: 8:14-CR-190-T-24-EAJ

Dear Ms. Mills,

Pursuant to our meeting and discussion of my case on August 28th 2014, I was encouraged to note that we seemed to have arrived at the core issue in this matter.

You mentioned that you were now clearer on the claims that the Government was making and I have therefore reiterated those issues below in order that, together, we move forward on the same page, clarity, and understanding. I have also addressed the core issues at the end of this letter and my notes and feelings on a trial strategy. I have also referenced the Bates number issued to the documents provided on the Government's discovery files where applicable.

Going back to out meeting on August 15th, 2014, you commented on a photograph the AUSA, Mancy Rydel, and her team had shown you during a meeting you had attended on August 12th 2014. You stated that the picture was of the "interior of an unspecified property". You went on to describe the picture as a "wreck of a property that you would not go inside off". In light of such comments you may recall I was greatly frustrated and commented that I cannot be responsible for the condition of said property years after I have sold it to a third party.

Discovery has since revealed a series of photographs purportedly taken in 2008 of a property with a derelict interior located at 8519 N Highland Avenue, Tampa (LLS-00110 & LLS 00177). This is not property I owned, visited, or even had any knowledge of and I most certainly bare no responsibility for it.

The Government has claimed the following in its original complaint of this case:

1.    I purchased property in dilapidated and/or condemned states and flipped it between various business partners to increase the value.

2.    I sought unsuspecting investors who were in some way duped into taking out mortgages in their names for property which was in a dilapidated and or condemned state.

3.    That sales of property between partnerships was entirely designed to "skim equity profits" for myself while allowing mortgages to default until such time as a new sale could be created. Quit claim deeds were executed to prevent the credit partner from exercising control over the property.

4.    That I conspired with others to deliberately default on mortgages in third party names for the purpose of defrauding FDIC insured lenders.

5. That mortgages were obtained through fraud and misrepresentation, engineered and facilitated by me.

6. The properties were un-renovated and the individuals I partnered with were innocent victims of a scheme I devised as early as 2003, which culminated in the fraud against FDIC lenders in 2006 and through January 2007, creating a loss of some $4 million.

I understand that item #4 above is a significant issue and has been transferred from the complaint to the indictment. Said item is further narrowed to refer to the sale of four specific properties to Ms. Fobare, who took out mortgages from Green Point Mortgage. However, in order to complete and preserve a full view of the subject, I have also addressed the other points below.

I do however want to go on record as saying that while voluminous at first sight, the discovery contained on the CD's I have been provided with are a furtive and rich collection of documentary evidence in my favor and a few of the highlights have been referenced in this letter.

## Repairs and Renovations:

The Government's own discovery shows bank statements, deposits and payment history for Invest Fund Corp. USA, Inc., and Maychen Inc., (two of my companies) from February 2006 to Mid 2007, where payments for materials and labor add up to sums approaching $250,000.00 USD for the fiscal year of 2006. (BOA-7514-00337 & BOA-6989-0488)

Both companies were used as operating accounts in the general day-to-day operations of our business, which was primarily concerned with property renovations. The Government has not provided bank statements for 2004 and 2005 and I suggest that we subpoena them. I know they will show further evidence of a similar pattern of spending for renovations on properties.

Discovery supplied by the Government is largely about the mortgage brokers and business partners Mr. Markus Esop and Ms. Belle Fobare, and their other clients and business partners. The issue of property deterioration is relevant however, and demonstrated in a file for a property that I did actually sell to Ms. Fobare and is relevant to the Green Point Mortgage issue for 915 East 23rd Street Tampa.

I had previously owned this property and sold it to the Esop/Fobare partnership in 2006. The Esop/Fobare Partnership received an offer from their realtor for a short sale in October 2007 in the amount of $160,000.00. Said offer is consistent with press reports of dramatic price drops in Tampa Bay at that time. The seller's realtor submitted the offer to Green Point Mortgage (Tampa Bay press reports used to support realtors claims See file: LO7-1164.pdf (P1) (Page 143)

In March of 2008, email correspondence between the realtor and seller about the same property, 915 East 23rd street, alluded to the realtor's frustration with Green Point Bank in dealing with short sales and their overall lack of response. In this subsequent correspondence the realtor references the substantial additional deterioration of the abandoned property and declares a reduced value of $100,000.00 due to such deterioration. This reduction resulted in a value of just $60,000.00. (LO7-1164.pdf (P1) (Page 159).

Each property was initially purchased and renovated using hard money mortgages, which facilitated both the purchases and the required renovations. The hard money lender's licensed appraisers inspected the properties prior to our purchase and at each stage, when renovations were completed, the escrowed funds detailed on the HUDS for the purchases were requested as a full or partial draw against those renovations.

The lender's appointed appraisers visited the property to confirm that the work had actually been completed and that he release of repair and/or renovation funds was necessary.

Please note that these HUDS and appraisals are not part of the discovery.

The hard money lenders we used operated legitimate businesses and used the services of licensed professionals. To suggest that renovations were not done and the sales of these properties were shams to increase prices is ridiculous and baseless.

### Investment partners:

You previously mentioned that the statement that 'concerned you' while reading the original complaint was the original investigator's quote that "Ms. Chen and her husband had lost money investing with me and were in some way duped into business dealings with me". This is ridiculous.

The evidence supplied in the Government's discovery demonstrated that Mr. & Mrs. Chen and myself maintained close business relations from 2004 through 2009, that Mrs. Chen was a signatory to multiple bank accounts for companies she and I partnered in, and she signed and wrote checks with funds from multiple company accounts . In March of 2006, Ms. Chen wrote and signed a check for $250,000.00 from Invest Fund Corp. USA Inc., representing the closing costs/down payment for a property we were purchasing at 4211 West North A Street in Tampa. (BOA- 6989-00488 & BOA-7514-00428).

In 2006, Mrs. Chen also drew approximately $100,000.00 personally from two of the companies as evidenced by some 40 plus checks she wrote, cashed or banked in her favor. (BOA-7514-00001). In a statement provided to investigators, Ms. Chen is claimed to have complained that she paid for a specific fee for a towing service related to Invest Fund Corp USA Inc., on her personal credit card in early 2006 ($1685) and "never got the money back".

In fact, Ms. Chen wrote and cashed a check for the exact amount in question and noted the reimbursement on the check memo. (BOA-7514-00394) During the course of 2004 and 2005, a time for which the Government did not seek a subpoena for bank statements for any of my companies, Ms. Chen, her husband, son and daughter –law, received approximately $150,000.00 or more from property partnerships they entered into with me. Mr. Stanley Chen, Susan Chen's son, who also allegedly made some negative remarks to investigators as to how he was also some sort of victim, passed to my company checks he received at his home address that were refund credits sent to him in his own name for sums due to the company on post property sale closings - not a likely move for a duped investor after the fact! (BOA-7514-00306)

Bank records for Invest Fund Corp. USA Inc. further show payments of tens of thousands of dollars in mortgage payments to various lenders throughout 2006. (See Disc #1 File BOA-7514-00337.pdf) This is again a far cry from the Government's allegations that mortgage payments were made only when properties were sold or re-financed.

Mr. Hurt, who is also referenced as some sort of victim in the Government's complaint, claims to have received a few hundred dollars from me, and he further claims to be innocent as to the operations of my business. He mentions only that I did in some way discount a property I sold to him for his personal residence at 4211 West Estralla Street in Tampa.

Mr. Hurt drew a weekly check of $600 plus dollars on a consistent basis, (Disc # 1 BOA-6989-00483.pdf) and signed documents on his mortgage application, for his own residence, which claim that the employment he held with my company was true and valid. (Disc # 1 BOA-9896-0001 pdf File page BOA-9896-00441). On the HUD closing statement for the sale of the property at 4211 West Estralla Street by my company to Mr. Hurt on November 12th 2004, the

*EXHIBIT 1C*

subsantial discount provided to him is shown in the amount of $131,956.88. (Disc #1 BOA-9896-00001.pdf. Bates Page Ref BOA-9896-00379). Mr. Hurt further details his work with my company in a letter to the lender of his personal residence dated September 7th 2005. (Disc # 3 File GMAC-00378.pdf Page Reference GMAC-00502) This is a signed letter in which he describes in detail, accurately, his employment duties and responsibilities.

There were no claims of fraud or financial loss made against me by Mrs. Chen, Mr. Hurt, Mr. Esop or Ms. Fobare prior to the Government's assertion that one or more of them were victims of my practices. Indeed, it is Mr. Esop and Ms. Fobare who plead guilty to mortgage fraud and who are now using this opportunity to get a reduction in their sentence. In a statement first made by Ms. Fobare to investigators, through her attorney, in 2010 she said; "Mr. Esop's business practices had bothered her for a long time but at no point before the Government's suggestion was it ever in the 'mix' or my dealings ever in question."

**Real Estate Values:**
Real Estate valuations were always provided by a variety of licensed appraisers, and in most cases several different appraisers valued a single property. The lenders, in general, directly instructed such appraisers.

If we look at one example of a property located at 4852 Troydale Road, Tampa, that I renovated and sold, a clearer picture may begin to emerge. (Using the Government's own discovery material.) This property was sold for $995,000.00 to a purchaser who we understood to be a credit partner of Mr. Markus Esop, a mortgage broker, to wit: Hermina Belle Fobare. Please see her letter to a lender asking for a short sale in 2007 and explaining her role. (Disc # 5, sub file: "File Disc 3", sub file, " Subpoena Request-Esop, Fobare and Hurt", sub file "Fobare-Seller-Title File" File title LO7-1178.pdf, PDF page number 47)

When Ms. Fobare purchased the property it was appraised by no less than four separate appraisers, all of whom were licensed and all of whom agreed as to the property's value. This loan was authorized by the lender at 100% of the purchase price according to the lender's own approval notice. (Disc # 1 BOA-3401-00001.pdf File page BOA-3401-00169) Additionally, the lender permitted the seller to contribute up to 6% of the purchaser's closing costs according to the lender's closing instructions (Disc #1 BOA-3401-00001.pdf Page BOA-3401-00181). This was a straightforward sale and Ms. Fobare, who worked with Mr. Esop, amended the closing package, supplied by the lender, to request that future bills for the payment of the mortgage be delivered to Mr. Esops office address directly. ( Disc # 1 BOA-3401-00001.pdf Page BOA-3401-00197).

As to the sale value and subsequent short sale some 12 months after Ms. Fobare's purchase, the 50% reduction in value is supported by appraisals and the absolute market forces in effect as of December of 2007. The purchase which occurred in 2006's market peak was, as stated, supported by no less than four separate appraisals and further, a lender's review appraisal, all of which can be found in the Government's own discovery.

**Esop & Fobare Partnership:**
Throughout the discovery files countless examples exist of the ongoing relationship between Mr. Esop and Ms. Fobare, both prior to and subsequent to their purchase of property from me. For example; there is e-mail correspondence from Mr. Esop's attorney to Mr. Esop addressing Ms. Fobare's titled properties, Mr. Esop and Ms. Fobare both used the same realtor for short sale marketing, they both use the same title agency to dispose of certain properties, and Mr. Esop is addressed by Ms. Fobare's realtor in printed material as the client in the sale of the property at 3510 North 11th Street, despite title and mortgage being held by Ms. Fobare. (Disc # 5 , sub file, "File Disc 3", sub file, " Subpoena Request-Esop, Fobare and Hurt", sub file "Fobare-Seller-Title File" File title LO7-1178.pdf, PDF page number 5).

**Quit Claim Deeds:**

The Government has also stated that quit claim deeds were signed in favor of my company post closing in order to provide control of the property to myself, with the debt left in the individual's name. This is a matter that the government says further demonstrates the control and ownership scheme of the property. No such quit claim deed exists between any property purchased by Mr. Esop, Ms. Fobare, and myself nor any of my companies. There are no documents to this effect found in the discovery and Ms. Chen and/or Mr. Hurt make no reference to a scheme or fraud by me in any of their statements, nor could they.

**Flipping scheme/Chain of Title:**

The scheme to which the Government refers to as "flipping" was, it seems, first referenced by WAMU and their own internal investigative unit after their investigation of the mortgage and foreclosure of the property located at 5005 Troydale Road Tampa. (As referenced in discovery statements).

It is claimed that the lender was a victim of mortgage fraud and a "flipping scheme". WAMU, it would seem, acquired the outstanding mortgage debt in 2008/20099 as part of the business practice of lenders who were themselves a very organized flipping scheme that existed on a national basis between the banks where debt was swapped and flipped between lenders.

In the case of 5005 Troydale road Tampa the original lender, Silver State Mortgage provided the loan to the buyer Naomi Esop. Silver State Mortgage when making the original loan was provided with details of the previous sales/flips (chain of title) for each transfer in the last 10 years of the properties ownership history (ACCU-00327) As I am sure you are aware documentary evidence of title chains are common place as a lenders requirement and it is at thier discretion or criteria as to weather a loan is acceptable on property with multiple sales in a short period of time etc.

Having addressed the more broad aspect of the Government's claims and focusing on the legal aspect of the indictment with it's direct reference to the sale of property by myself or my company/s to Ms. Fobare, who mortgaged these properties through the FDIC lender Green Point Mortgage, and the core issue of post closing payments for those closings, I raise the following questions and points:

1. The discovery supplied does not include an executed closing package for each of the four properties in question, those documents being a HUD, deed, mortgage package, purchase and sales contracts and addendums, lenders appraisal, financial ledger and disbursement etc.

2. One HUD referenced as "final HUD" in the closing of **915 East 23rd Street Tampa** is definitely not the final HUD in the transaction. The ledger and deposit actually received against the sale references $129,884.12 due to the seller. (Disc # 3 SL-00160) however, the HUD references an amount of $132,625.62. (Disc # 3 File SL-00129) This HUD is signed by what looks like my signature but not by the seller, it is however, stamped "final" but it is a non fully executed HUD and therefore could not have been the final HUD submitted and approved by the lender. Signing multiple HUDS prior to a closing is common practice and frequently done via email in the build up to a closing. These actions can occur a number of days prior to a closing. Numerous other files in the Government's discovery contain erroneous and misleading closing statements and mortgage packages for properties other than the properties they purport to be for. Great care, I note, must be taken in examining each page and its relevance, date, and placement in the files the Government is providing.

3.    In relation to **3510 N 11ᵗʰ street Tampa** I note numerous applications for the mortgage are included in the file for the property, one says the seller contribution (Line K) will be $0 (PMF-4707-00006) another, $4914 (PMF-4707-00010) another, $9000 (PMF-4707-00024). This is an example of the paperwork that seems to be prevalent in each of the mortgage files. What information was shown and shared with myself and or my partners attending the closing as the sellers is hard to actually say and impossible to speculate as to what was actually shared with the lender.

4.    Purchase and Sale contracts and most particular, sales contract addendums, would generally spell out additional terms and details for the sale of the property however, the contracts for the sale of these properties (in the files supplied) do not bare my signature (PMF-4707-00083 and PMF-4707-00084) in relation to **3510 North 11ᵗʰ Street** and the signature on the addendum is also not my signature. (PMF-4707-00087) It would also be unlikely and unheard of for a lender to issue a loan without a contract that provided for a closing on or within the closing date specified on the contract, or a fully executed addendum extending the closing date.

In the case of the above mentioned property, the closing occurred between November 27ᵗʰ 20006 and December 1ˢᵗ 2006. The contract provided by the Government as the contract submitted to the lender details a closing on or before November 15ᵗʰ 2006 and there is no record of an extension to the contract in the files, which would further alert me to the very real possibility that this was not the contract submitted to the lender. *Typically in my normal business practice I would introduce an addendum of how the deal was to be structured if it followed any type of extraordinary payment scenario.*

Other contracts exist where I have detailed exactly the structure of a deal in a highly graphic way so as meet the bar of full disclosure. In relation to the property at **915 East 23ʳᵈ Avenue** the contract supplied by the Government for the sale to Ms. Fobare on November 17ᵗʰ 2006 also expired on November 15ᵗʰ 2006. (LO7-1164(P1) Page 100) The sales contract for **2306 North Nebraska Avenue** included in the closing file for the property also doesn't bare my signature and I can state it is not a contract form and type that I have, to the best of my recollection, ever used. (Disc # 2 BOA-Fobare-1890) This contract was also expired and out of date by nearly a month before the closing occurred.

**The Following is a bullet point list of each of the four Green Point Mortgage properties in question:**

·    *2306 North Nebraska Avenue*  Disc 5 file cssu-000178 and cssu-000179 page 252 & 256. Ms. Fobare provided Markus Esop's office address as the mailing address for mortgage billing at the closing. (page 266) (Also shown on Disc 3 File BOA-Fobare-01739 Bates Page BOA-Fobare-01803).

·    The mortgage package says the seller is also able to pay $18,600 in closing costs (Disc 5 file cssu-000178 and cssu-000179  page 298)

·    There are two appraisals in the closing file but the actual appraisal that was used, it would seem, is ordered by the lender directly and one that I have never heard of as a company. The other appraisal is ordered in the name of Esop's mortgage company but does not appear to have been used. (Disc # 3 File BOA-FOBARE-01739, Bates Page BOA-

FOBARE-01776) The property sites of these original appraisals will show pictures that are a far cry from the condition displayed in the pictures the Government is touting.

- The purchase for this property was affected by two mortgages, a first and a second one, in the form of a HELOC, both from Green Point Mortgage Funding Inc. The documents listed as the HELOC approval from Green Point states in its closing instructions that the documents for the HELOC are signed/executed 24 hours prior to funding. (Disc # 3 File BOA-FOBARE-01739 Bates page BOA-FOBARE- 1757) However, the HELOC documents are signed and dated October 12th 2006, the same day as the HUD and Note and Mortgage, therefore it is hard to know how this deal was actually funded when the lender required documents 24 hours in advance in order to release funds.

- The sales contract shown on file Disc # 3 FOBARE-01739 Bates Page BOA-FOBARE-01890 does not contain my signature.

*These highlights, primarily in respect of 2306 N Nebraska, are just preliminary findings and I will work further on the remaining three Green Point Mortgage properties in the coming days, i.e., 3510 North 9th Street, 915 East 23rd Street and 3510 N 11th Street, Tampa.*

This is just the start of my detailed and forensic analysis of the sale and purchase and subsequent history of the property referenced as the Green Point Sales but my initial findings are such that I am wondering what comments I can really make if the actual closing documents are not available in their entirety. Furthermore, the general claims are baseless and false. One property was listed on the MLS in March of 2007 appropriately priced in a declining market to be ruined by the seller's abandonment. (*Typical issue of condition when seller lets them fall into abandonment in 2007 this property was listed at $189k needing TLC. Months later it was wrecked due to neglect. This listing was taken on March 7th 2007. In File Disc 5, Sub file Disc 3, Sub File Fobare-Seller-Real Estate File LO7-1163.pdf page20)*

You further referenced at our meeting on Thursday, August 28th 2014 that you had real concerns that if, as you suspected, an officer representing Green Point Bank attended the trial and was asked if the Bank would have made these loans knowing the buyer were potentially using the sellers funds to either, in whole or in part, cover closing costs and or down payments, that such a statement would in effect seal the notion that the lender was in some way defrauded.

My response to that point lies in the issue of what the lender knew, which of course I have no knowledge of as I was not the Mortgage Broker or applicant and therefore it is impossible for me to know what difference this information may or may not have made. The issue of post closing payments to the buyer is also extremely significant in that the buyer would have needed to meet the bar for proof of funds and disbursement of funds at the closing to satisfy the lenders criteria. This is a matter, I understand, the title agent / attorney closing the purchase and sale would be required to attest to. (See closing document attestation by Title Agent and Buyer .(File BOA-FOBARE-01830)

Green Point Mortgage, wanting to compete aggressively with other sub prime lenders, had lending criteria that required no seasoning and/or sourcing of funds for closing costs and down payment as evidenced in their lending criteria also available in discovery. (BOA-FOBARE-020 2).

Prior to the frenzied lending activities of banks, monies used to cover closing costs and down payments were required to be evidenced in the applicant's accounts for a period of usually 90 or more days to be eligible for use in a purchase transaction and further the proof that the funds were indeed those of the applicants. In so far that Green Point removed this criteria, it is hard to understand what difference the issue of the source of the funds would have had on the issuance of

the loan beyond some thinly veiled need of the lenders in furtherance of their own flipping scheme.

In a letter from Green Point Bank 'whole sale division' dated November 30th 2006, they instruct the notary of the closing of **15 East 23rd Street**, 13 days post closing, to add a signatory attestation to the mortgage documents, (Disc # 5 Sub File "File Disc 3" Sub file "Subpoena Request-Esop, Fobare and Hurt" sub file "Fobare-Seller-Real Estate File' Sub File, " LO7-1164 (P1)" Page 60) and to correct the date of the notary's attestation (page112). A fact I reference in so far that I am confused and concerned about certain events and what dates we can actually rely upon as the true dates these transactions took place on.

Mr. Yost and Mr. Larue, a practicing attorney, felt they were able to sign those closing statements and disburse funds for these closings, and I am myself confused in so far as the disbursement of funds in actuality.

I am still having a Statute of limitations issue in so far as it is my understanding that banks are only required to maintain records for a period of seven years and the statute of limitations on mortgage fraud is five years. With this in mind, if certain bank records are unavailable, how is the Government able to satisfy the burden of proof or reasonable doubt on a conspiracy to wire fraud charge related to mortgage fraud seven years past my last financial involvement with these properties?

Mr. Esop and Ms. Fobare misrepresented numerous details to lenders in applications for mortgages and have plead guilty to these acts, but I would not know the contents of the loan applications. I had no reason to believe the loan applications were fraudulent when such mortgage products as "No Income" & "No Asset" verification and stated programs were widely available in the market place. Examining discovery I note another property I sold, although not referenced as a Green Point Mortgage case was for $1 million dollars, which the borrowers were able to get a 100% mortgage for. The lender procured the entire purchase price of the property, therefore, how is the seller liable for what in that case amounted to a subsequent short sale of $400,000.00?

One lender for the funding of **711 East James Street**, a property I sold to Mr. Esop, I note faxed the closing office of Attorney Scott LaRue with the comment, "HUD Looks Good, I need a copy of a Cashiers Check with borrowers name as remitter in order to close." Such was the criteria of lenders at this time and I have no knowledge where those funds originated but I do know it is possible to have anyone's name added to a Bank Draft as the remitter! (Disc # 3 SL-00407.pdf Bates page SL00-715)

Green Point Mortgage published their criteria for lending and numerous terms for the various lending products they provided. They do not reference the need for verification of source or seasonality of down payment funds. (Disc # 2 Lenders term sheet BOA-FOBARE-01739-02009) The Bank's criteria at the time stated, "cash to close can be documented either by a verification of deposit or by two consecutive months bank statements." How would I have known what was shown to the lender and indeed if this was the requirement how is the post closing credit sign ficant to mortgage fraud when the reliance on the application, appraisal and the individual's credit rating was the absolute basis for the loan?

I do note with concern that several statements collected by the Government suggests that I was a mortgage broker and while I find this absurd, I am concerned that as a part of the general manipulation of statements and overall exaggerations, it is one more lie to over come. Fortunately, the hard evidence demonstrates that Mr. Esop was the Mortgage Broker through multiple disguises and received fees at almost every turn and even in his own wife's admitted mortgage frauds. However, despite Mr. Esop's plea agreement, where I note he acknowledges his role as a mortgage broke, his attorney then states in the argument for downward departures for his

PSI   hat he "was not the mortgage broker". It seems today that statements are made to suit the circumstance rather than as a matter of fact.

I appreciate that we have found certain communications and I have raised the issue several times now is to whether it is indeed the subject matter of these communications that has created a barrier to our ability to come together on a strategy for my defense.

I understand I am risking my liberty for years to come in going to trial and frankly, as an innocent party, I see absolutely no choice in that regard. I do however urge you to look inside yourself and hone stly question your own abilities in this area. Perhaps you should take the time to look closely at the documentary evidence in this case. Working on this material while in jail as you know is incre libly difficult, not to mention how hard it is to get access to discovery and even harder to get confidential material out of the jail in order to participate in my own defense.

Finally, during our meeting on September 4th 2014, when I explained the lack of authenticated executed closing documents for each of the Green Point Mortgage properties, including the issue of valid sales contracts, etc., you stated you would email the Government that day and request those documents from them. I do not believe they exist in the discovery material I have seen and woncer if sharing our work and findings with the Government is the best trial strategy in an adversarial relationship?

Sincerely,

/s/Stephen Mayer
Stephen Mayer.

cc.
Dell Vitier

I have detailed below the highlights of what I believe we will need to achieve a comprehensive and well-rounded defense.
*Action List:*
1. *I am still awaiting a copy of Ms. Fobare's plea agreement and details of her statement.*
2. *Complete file of the properties referred to as "Green Point Properties"*
3. *Closing Statements*
4. *Contracts and Addendums*
5. *Lender's Rate Lock Sheet*
6. *Documents Detailing Appraisal Relied Upon in Issuance of the Loan*
7. *Fully Executed Mortgage Package*
8. *Fully Executed Deeds*
9. *Lender's Loan Application Certified as Relied Upon by the Lender*
10. *Lender's Detailed Criteria for Issuance of Loans and Under What Specific Program*
11. *Bank Records, 2004 & 2005  Chen Garza Inc,  Galoma Investment Group Inc, Josh One Son  Inc,  KCSC Inc, Banquest Select Group Inc. All accounts at Bank Of America.*
12. *Research issue of S.O.L.  and Case Law re HUD declarations, Sellers attestations and Seller assisted closings etc.*
13. *Forensic Accounting/ Expert Witness attesting to Chen and Hurt Payments Payroll and Materials and mortgage payments.*
14. *Real Estate Attorney Expert witness, issue of flipping etc*
*Misc:*
*Never seen a HUD without sellers signature line.  (see SPS-00045 SPS-00047 Disc 4*

**Stephen Mayer**
Pinellas County Jail Docket # 1599371
Tampa, Fl, USA

September 5th 2014

Mary Mills
Assistant Federal Defender
Park Tower - Suite 2700
400 N Tampa St
Tampa, Florida 33602


   Re:   United States v Stephen Mayer, Case Number: 8:14-CR-190-T-24-EAJ


Dear Ms. Mills,

Subsequent to my finalizing the attached letter, we met yesterday on September 4th 2014 and you illustrated via Power Point the core issue of the Government's case, as you interpret it. This presentation included the furtherance of the notion and idea that property prices were inflated through sham sales and the sham use of hard money lenders for non renovated property.

You specifically referenced 2306 Nebraska Avenue, Tampa as a wreck of a property, offering as evidence an exterior photograph you claimed to have pulled from Google and which you further claim was from 2007. You also claimed through your own research that the prior sales prices for the property was impossible to have been market appropriate in 2005 and 2006.

I pointed out that this property was fully renovated in 2004/2005 and further, that it was sold on October 12th 2006 to Ms. Belle Fobare. I obviously cannot be expected to bare responsibility for it's condition and deterioration subsequent to its sale. At our meeting, I offered as evidence, off the top of my head, the fact that this was a renovated property and that in December of 2005 I threw a holiday party on the second floor of said property as a themed casino night for both friends and staff.

Local Tampa attendees included Mckiver Berner, Michael Stewart, James Wardell, Esq., and a host of others. I said I would work on providing a greater list of attendees who will possibly remember the property and evening in question. I further stated that the property was professionally appraised by a licensed professional appraiser and I would think this could and should bare substantive proof of the facts of the value and condition as I have stated them.

I am however extremely concerned that this is the second time the Government investigators have managed to distract you and your colleagues with baseless claims and questionable photographic evidence.

According to the official loan documents from Green Point Mortgage for the loan used by Ms. Fobare in the purchase of this property on the 12th of October 2006, (Disc #2 BOA-Fobare-01739 Bates Pages BOA-Fobare-02021) the appraisal was conducted by Yucca Realty, (License # RD2903) a company I have never heard of, or to the best of my knowledge, ever dealt with. The

appraised price was consistent with the sales price of $310,000.00 for the sale on October 12th 2006 I can find this particular appraisal in the Government's discovery and I see that it as relevant in that it is clearly the appraisal on which the lender relied upon in making the loan. A review appraisal was also conducted by a second licensed appraiser, Melissa Lester ofMetro West Appraisal Co. Said appraisal stated that the, "Reviewers Opinion is $310,000.00 Value". (License # RD5572 Disc # 2 File BOA-Fobare-01776) This is also an individual or company I have no recollection of and believe that both appraisal companies were selected and instructed directly by the lender.

On October 22nd 2007, more than one year after the sale by me to Ms. Fobare, in a time period when the real estate market had seen prices drop by as much as 40%, a realtor by the name of Sandy Cooper, of Unity One Title and Land, acting for Ms. Fobare, writes, in a fax, to Green Point Mortgage, that "the previous offer for $206,500.00 for the property has been withdrawn". She goes on to make a submission of a new offer in the amount of $150,000.00. (Disc # 2 BOA-FOBARE-02023).

Evidence shows a copy of a check for the earnest money deposit by the initial proposed purchaser, Lidia Gilan, and the HUD settlement statement for the proposed purchase in the amount of $206,500.00. (See Disc # 5 Sub file "Disc 3" Sub File 'Subpoena request-Esop, Fobare and Hurt", sub file "Fobare-Seller-Title File",Sub File " 07-1204, sub file "HUD Settlement Statement" & "Deposit from borrower" ).

The property was doubtlessly listed with pictures on the MLS however there are four more exterior pictures of the property showing it was clearly inhabitable and occupied in pictures dated April 2007 in the file. (See Disc # 5 Sub file "Disc 3" Sub File 'Subpoena request-Esop, Fobare and Hurt", sub file "Fobare-Seller-Title File" , Sub File 07-1204 subfile, "Esop-2306 Nebraska Ave"). The contract for the proposed purchase at $150,000.00, signed by the buyer, can be found at th's file reference (Disc #2 BOA-FOBARE-02023 to -02025). It would seem that this sale did not close but a further offer at a later date was made by contract from a Mr. Juan Ramos for $175,000.00 on January 15th 2008 (BOA-FOBARE-02031 to 02037).

Clearly this evidence is a far cry from the constantly speculative statements that the Government has made and I think you will agree that the vast amount of discovery supplied by the Government only further illustrates and supports my claims and explanations. Such discovery further dispels the myth of "un-renovated properties with over inflated appraisals".

After reviewing the overwhelming documentary evidence as to the condition and value of this property when I sold it, I am startled by both your stance and the government's stance as to its previous value at the time I sold it. I am greatly disturbed by the realization that everyone's thinking is prejudiced and property values are in question due largely in part to this neighborhoods makeup. This alerts me to the issue of jury selection and the extreme care that must be taken in making appropriate selection of individuals capable transcending racially stereotype thinking.

In closing, at this meeting you remarked that you could understand my frustration and that you thought I wanted to put the banks on trial. You went on to tell me that wouldn't happen and stated that the offer of five years as a plea agreement by the USA should be considered. For the record, I don't care about the banks; I do however feel tremendously frustrated. I have stated numerous times that I want a trial and I am not interested in pleading to crimes I did not commit.

I beg and pray that you will put as much time and effort in proving my innocence as you have in trying, and failing miserably, to prove my guilt. I ask only that the documentary evidence and the Law be followed; a path I feel confident, once traveled, will provide a light at the end of the tunnel I am currently trapped in.
Sincerely,

/s/Stephen Mayer
Stephen Mayer.

cc.
Donra Lee Elm ( Via Fax & US Mail)
Fair Trails International
Daniel Jonas Esq.
Valerie Jonas Esq.
David Weider Esq.
Daniel Whitiker Esq.
Chris Grifith Esq.
Cynthia O'Murchu ( London FT)

.

**Stephen Mayer**
Pinellas County Jail
4400 North 49th Street
Clearwater, Fl 33762
Docket Number 8:14-CR-190-T-24 EAJ

September 17, 2014


Mary Mills
Assistant Federal Defender
Park Tower - Suite 2700
400 N Tampa St
Tampa, Florida 33602

   Re:  *United States v. Stephen Mayer*, Case Number: 8:14-CR-190-24EAJ
      The Green Point Mortgage Properties

Dear Ms. Mills,
On September 15th, 2014 your paralegal, Rose, delivered the packages for the four (4)
Green Point Mortgage Properties. I have now had the opportunity to carefully examine
each package and can confirm that each package is incomplete. Furthermore, I highly
doubt that these packages meet the standard for a contested foreclosure action.

Please see below for my notes and analysis of the Green Point Mortgage Properties
packages:

### 3514 N. 9th Street:
1. There is no closing package signed or certified by the Lender.
2. There are no copies of the Lender's documents for due diligence, i.e.,
  leases, copies of bank statements and/or proof of funds to close, as
  required by law.
3. There are no certified copies of the HUD 1 accepted by the Lender and
  signed by all parties.
  a. The HUD included is not signed by the closing attorney.
  b. The HUD is altered by ink pen. The Lender's own instructions
   specifically forbid this. See SL-02176: "Hand written amendments are
   unacceptable."
  c. The signature which appears to be my signature looks as if it is
   digitally imposed. Please pay close attention to how the word "corp"
   appears to be imposed over my signature. (See SL-02133).
4. The contracts are invalid. Both contracts were expired at the time of
  closing and most importantly, the signatures on these pages are NOT
  mine.
5. Page 3 of 3 for the signature page of the Note is missing.

6. The appraisal is certified to Premier Mortgage Funding, not Green Point. There is also confusion as to which company Green Point relied upon for the appraisal and in the absence of the Green Point Mortgage package, we cannot know with any certainty.

7. Pages 11 and 12 of the HELOC second mortgage are missing.

### 3510 N. 11th Street

1. The inclusion of a deed for a previous transfer in 2004 and an old violation that occurred 10 months before the Fobare sale is the Government's attempt at raising a distraction.

2. There is no closing package signed or certified by the Lender.

3. There are no copies of the Lender's documents for due diligence, i.e., leases, copies of bank statements, and/or proof of funds to close as required by law.

4. The appraisal is not certified to Green Point (BOA-Fobare-00016). The Lender's closing package and rate lock sheet would confirm the appraisal used.

5. The contracts are invalid. Both have expired at the time of closing but most importantly, the signatures on these pages are NOT mine. (See SL-02070, SL-02073, and PMF-4704-00083 to PMF-4704-0086)

6. The loan application does not reflect the contract addendum. (See SL-01968)

7. There is no executed HUD. There are no signatures. (See SL-01792)

### 915 E. 23rd Avenue:

1. There is no closing package signed or certified by the Lender.

2. There are no copies of the Lender's documents for due diligence, i.e., leases, copies of bank statements and/or proof of funds to close as required by law.

3. Attorney Attestation to closing is missing a signature.

4. Page 3 of 3 for the signature page of the Note is missing.

5. The contract has expired and does not bear my signature.

Note that on page #2 of your summary for this package your characterization of Compass Lard and Title is incorrect as Compass Land and Title DID NOT perform this closing.

### 2306 N. Nebraska Avenue: (Please refer to the Nebraska file you are already in receipt of)

1. As you are aware the picture of this property on the cover page is highly misleading and predates the Fobare purchase.

2. The contract was expired, it was not a form type that I used and was not signed by me.

3. The appraisal included is not the one Green Point relied upon, per their own documentation.

4. Missing Green Point Mortgage package certified and executed by them. Including the loan documents, proof of funds, leases, etc.

Not one of these closing packages contains a Purchase and Sales Contract that is signed by me or addendum detailing any cash back or special terms. Addendums stating closing costs and payments equivalent to a percentage of the purchase price would have been appropriate.

I was always clear with Esop that any payment made post-closing required the HUD to be accurate in so far as I reserved the gross amount identified on the HUD. Yost and I actually had a falling out because I questioned him about his practices while closing the sale of another property located at 711 James St. He continued, I note from discovery, to work with Esop in the same manner subsequent to my departure from his office.

I also remember I deposited $50,000.00 into another account, the Spenmark, Inc. account, which Esop could draw from and did so. (Full copies of my bank statements, my deposit and his withdraw exist in discovery)

I am trying to remember the details of the structure of these deals but I am very confident that the structure exists in contract addendums.

Clearly the issue of a second mortgage for 915 E. 23rd St. would not have been necessary if the arrangement was some sort of scam.

Thank you for the case law. I am having difficulty determining which cases would be applicable to my situation, in so far as:

1. No "scheme" existed.
2. The Lender's criterion for loans was met prior to closing.
3. Disbursements of funds were in accordance with the HUD.
4. Contracts and/or addendums existed detailing the transaction.
5. Fobare admitted her role as an investor in writing to the Lender.

I am baffled by the notion that when a Lender's criterion is met post-closing, the seller's proceeds may be policed.

I appreciate your time and consideration of the above.

Sincerely,

/s/Stephen Mayer
Stephen Mayer

Donna Lee Elm
Del. Vitier
Daniel Jonas, Esq.
Valerie Jonas, Esq.

**Stephen Mayer**
Pinellas County Jail
Docket Number 1599371

September 9th 2014

Donna Lee Elm
Pub ic Defender
Middle District Florida
Park Tower - Suite 2700
400 N Tampa St
Tampa, Florida 33602

        Re:     United States v Stephen Mayer, Case Number 8:14-CR-190-T-24-EAJ

Dea· Ms. Elm

At the time of writing this letter, I am deeply concerned that my appointed attorney has failed to pursue the appropriate course for the defense of my case.

My trial is scheduled for October 27th. At this stage, it is hard to see what preparation Ms. Mills has undertaken, despite my numerous requests for the underlying documents in support of the indictment against me as well as any case law in support of such indictment.

The attached correspondence addressed to Ms. Mills highlights my concerns and the substantial research I have undertaken with regard to my own case. I would respectfully request and urge your office to provide Ms. Mills with additional support and expertise relating to the subject matter of my case. I am deeply concerned that the prevalence of thinking "business as usual" and "rubber stamping" government accusations with plea deals is on the forefront of Ms. Mills' mind.

Your assistance is greatly requested.

I appreciate your time and attention this most important matter.

Sincerely,

/s/Stephen Mayer
Stephen Mayer.

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,

v.                                                           Case No: **8:14-CR-190-T-24EAJ**

STEPHEN MAYER,

_____/

**ORDER**

Motion:       **Government's Amended Motion for a Protective Order Regarding Discovery.**

              **(Dkt. 41)**

Filing Date:  October 15, 2014.

Disposition:  **GRANTED to the extent that:**

       (1)    A hearing on the motion will be held at **2:00 p.m.** on **Tuesday, October 28,**

              **2014,** in Courtroom 11A of the United States Courthouse, 801 N., Florida

              Avenue, Tampa, Florida.

       (2)    Pending the hearing, all parties in the case, including Defendant Stephen

              Mayer ("Defendant"), are instructed that:

              (a)    The discovery materials provided in this case, their contents, and any

                     notes or other record of such materials or their contents, shall not be

                     disclosed either directly or indirectly to any person or entity other

                     than Defendant, Defendant's counsel of record, persons employed to

                     assist Defendant's counsel of record, individuals who are interviewed

                     as potential witnesses in the case, or such other persons as to whom

                     the Court may authorize disclosure.

(b)   Such discovery materials shall not be copied or reproduced except as necessary to provide copies of the material for use by an authorized person as described above to prepare or assist in the defense, that all such copies and reproductions be treated in the same manner as the original matter, and that any discovery materials previously disseminated to third parties be immediately returned to the government;

(c)   Counsel for Defendant shall inform the defendant of the provisions of the Protective Order, inform the third parties hired by the defendant of the Protective Order, and direct these parties not to disclose or use any information contained in the government's discovery in violation of the Protective Order.

(d)   Nothing contained in the Protective Order will preclude any party from applying to the Court for further relief or for modification of any provision hereof.

**DONE AND ORDERED** in Tampa, Florida on this 15th day of October, 2014.


ELIZABETH A JENKINS
United States Magistrate Judge

2

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA FLORIDA

UNITED STATES OF AMERICA

v.                                          Case No. 8:14-CR-190-T-29EAJ

"EX PARTE/ IN CAMERA"

STEPHEN MAYER

_____/

## DEFENSE COUNSEL'S UNOPPOSED MOTION TO WITHDRAW AS COUNSEL AND REQUEST TO APPOINT NEW COUNSEL AND REQUEST FOR HEARING

COMES NOW, STEPHEN MAYER, counsel for the Defendant, and moves this Court to: **PERMIT HIS WITHDRAW AND APPOINT NEW COUNSEL.** As grounds for this motion, undersigned counsel proffers the following:

1.     Mr. Mayer was originally charged in a one-count indictment, which charged him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343. See Doc. 3.

2.     On September 30, 2014, the Government filed a superseding Indictment, charging Mr. Mayer with eight additional counts of wire fraud, in violation of 18 U.S.C. § 1343. See Doc. 30.

3.     Undersigned counsel was appointed to represent Mr. Mayer on July 17, 2014. See Doc. 11.   At that time, counsel was informed by the government

that Mr. Mayer's case involved approximately 37,000 documents, and dozens of witnesses.

4.     Prior to the status conference on August 21, 2014, undersigned counsel met with Mr. Mayer to discuss his case and to talk about speedy trial issues. Counsel informed Mr. Mayer that, given the nature of the case and the voluminous discovery involved, she did not believe she could be prepared to effectively represent him by September 25, the day the government had calculated that Mr. Mayer's speedy trial would run.

5.     On August 21, 2014, this Court held a status conference with counsel and Mr. Mayer. At the hearing, counsel informed the Court that she could not be ready to provide effective assistance of counsel to Mr. Mayer by September 25, 2014. At this conference, Mr. Mayer agreed to waive speedy trial through October 27, 2014, to allow counsel additional time to prepare his case for trial See Doc. 17.

6.     At the August 21, 2014 hearing, counsel informed the Court that discovery had been provided, and that a procedure had been arranged for Mr. Mayer to look at his discovery at the jail on a laptop computer. Mr. Mayer acknowledged that this process had been scheduled for him. Counsel also informed the court that she would make every effort to prepare for trial by an October 27, 2014 date certain.

7.     Since that time, Mr. Mayer has written several letters to undersigned counsel, and to undersigned counsel's supervisor, in which he complains that counsel and her office are not providing effective representation for a variety of reasons. Mr. Mayer does not write these letters directly to counsel, but sends them to third parties to be typed, and then e-mailed or faxed to undersigned counsel.

8.     Counsel asked that Mr. Mayer be allowed to address these complaints regarding counsel's representations before Magistrate Judge Jenkins at his arraignment hearing on the superseding indictment on October 8, 2014 See Doc. 35. At an *ex parte* hearing, Mr. Mayer stated that he disagreed with counsel about the decision whether to call expert witnesses at his trial, and made reference to certain bank records which he believed had not been requested by counsel. However, Mr. Mayer did not request new counsel, and Judge Jenkins did not rule that new counsel should be provided.

9.     Subsequent to the hearing, counsel received additional correspondence from Mr. Mayer, through a third party, Attorney Daniel Jonas, expressing his continued dissatisfaction with counsel's representation and other complaints about the sufficiency of October 8, 2014 hearing before Judge Jenkins. Daniel Jonas has made several visits to Mr. Mayer at the jail during the course of undersigned counsel's representation and has engaged in numerous phone calls, during which he has given Mr. Mayer legal advice in this case.  Counsel has also

learned that Mr. Mayer has been communicating with and receiving legal advice from at least one other attorney, Akiva Fischman, in the Miami area.

10.    On Friday, October 10, 2014, counsel was informed by the government that confidential information regarding other individuals contained in Mr. Mayer's discovery has been disseminated to third parties. Undersigned counsel has been told that Mr. Jonas is one of these individuals. The government has filed a motion for protection relating to this information. This motion was denied without prejudice, because the government had not obtained the Defendant's position on the motion. However, undersigned counsel understands that the government intends to refile that motion with Mr. Mayer's position today.

11.    On Tuesday, October 14, 2014, counsel received a call from the Pinellas County Jail informing her that Daniel Jonas and Ashley Small visited Mr. Mayer at the jail for an attorney visit.    The same day, counsel received correspondence from the Miami attorney, Daniel Jonas, on Mr. Mayer's behalf. In this letter, Mr. Jonas directs undersigned counsel what to do in Mr. Mayer's case and what trial strategy to employ.

12.    Also on Tuesday, October 14, 2014, undersigned counsel went to the Pinellas County Jail to discuss these matters with Mr. Mayer. After informing counsel that Mr. Jonas had sent her a letter containing instructions for his defense,

Mr. Mayer terminated the interview and is now refusing to speak with counsel, directing her to put everything in writing.

13.   The trial of this case is in less than two weeks.  Mr. Mayer has raised numerous complaints and concerns relating to his defense, including his entire defense strategy.  Mr. Mayer has also raised complaints that undersigned counsel will not be sufficiently prepared for trial on October 27, 2014.  He has sought the advice and counsel of another attorney, who is giving Mr. Mayer legal counsel and advice and interfering in Mr. Mayer's case.  Mr. Mayer is also refusing to discuss his defense or case with his appointed counsel, and is instead communicating and addressing his numerous complaints about counsel through third parties.



14.   Under the circumstances, undersigned counsel believes it is appropriate to bring to this Court's attention that she and Mr. Mayer have reached irreconcilable differences in the instant case.  In fact, it would be appropriate to characterize the relationship as irretrievably broken.

15.   As a result, undersigned counsel requests this Court appoint counsel outside the Office of the Federal Public Defender to represent Mr. Mayer.  Because this case is currently scheduled on October 27, 2014 for trial, counsel respectfully requests that this Court hold an *ex parte* hearing as soon as possible to resolve this issue, so that counsel and Mr. Mayer may address these issues with the Court.

16. Assistant United States Attorney Mandy Reidel does not oppose the instant motion.

**WHEREFORE**, undersigned counsel request that he be permitted to withdraw from any further representation of Mr. Stephen Mayer and that new counsel be appointed.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** by U. S. Mail to Stephen Mayer, Pinellas County Jail Docket # 1599371, Pinellas County Jail, 14400 49th Street North, Clearwater, Florida 33762 on this 15th day of October.

**RESPECTFULLY SUBMITTED,**

DONNA LEE ELM
FEDERAL PUBLIC DEFENDER

Mary A. Mills
Missouri Bar No.: 0038369
Assistant Federal Public Defender
400 N. Tampa Street, Suite 2700
Tampa, Florida 33602
Phone: (813) 228-2715
Fax: (813) 228-2562
Email: Mary_Mills@fd.org